**CALL CARL, INC., a Delaware Corporation, et al.**

v.

**BP OIL CORPORATION, a Delaware Corporation, and Standard Oil Company (Ohio), an Ohio Corporation.**

**Civ. No. 73–1059–Y.**

United States District Court, D. Maryland.

Oct. 22, 1975.

Jerry S. Cohen, Herbert E. Milstein, Michael D. Hausfeld, Washington, D. C., William C. Sammons, Morris Rosenberg, Baltimore, Md., for plaintiffs.

Benjamin R. Civiletti, John Henry Lewin, Sr., John Henry Lewin, Jr., Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

The plaintiffs in this action are individuals and corporations acting as independent service station operators under one-year franchise agreements with BP Oil Corporation [BP]. The defendants are Standard Oil of Ohio [SOHIO], a major marketer and refiner of gasoline, and its wholly owned subsidiary, BP.

The case went to trial on all issues, and on May 2, 1975, the jury returned a verdict in favor of all plaintiffs and against both defendants in the total amount of $1,265,000 under Count IV of the complaint.

At trial, the defendants moved for a directed verdict on all counts at the end of all evidence, and the Court granted the motion as to Count I. The reasons supporting the directed verdict on Count I are elaborated more fully below.

Defendants have now moved for a Judgment Notwithstanding the Verdict under Fed.R.Civ.P. 50 or in the alternative for a new trial on all issues of Count IV under Fed.R.Civ.P. 59. As hereinafter discussed, the verdict will be set aside and a new trial ordered on the issue of damages unless within fifteen days the plaintiffs file a remittitur as set forth below.

### FACTS

For the purpose of clarity, the facts of the case should be set forth briefly. SOHIO purchased BP for a marketing arm on the East Coast at a time when BP was operating at a loss. SOHIO and BP then launched a long-term marketing

study which analyzed the principal East Coast markets in which BP owned stations. Lee Hickerson, a SOHIO employee, was transferred to BP as the manager of the market development plan, and took charge of the study. A report on the Washington, D.C. market was presented to BP and SOHIO in November, 1970, and a report on the Baltimore market was presented in March, 1971, followed by reports on other markets, each recommending that BP acquire additional sites and expand its conventional business.

The Hickerson group then presented a new market study of the Philadelphia market which recommended that BP radically alter its conventional marketing approach there in order to offset losses and gain in market share. The report suggested that BP divest itself of its unprofitable stations, institute station/car wash services, and transform 20 of the high volume stations into company owned and operated high-volume/cut-rate "gas and go" stations. The Philadelphia recommendation was put into effect in 1972, and the plan met with instant success.

Total volume sales did not increase in the Baltimore-Washington area, however, and in late 1972, the Hickerson group re-examined the market situation there and determined that its prior recommendation that BP remain a conventional marketer was incorrect, suggesting instead that the Philadelphia plan might work as an alternative marketing approach in the Baltimore-Washington area.

As a result, on May 9, 1973, Hickerson produced the "BP Northeast Project Report and Recommendation." This report, in substance, recommended that BP adopt the same plan which had operated in Philadelphia in the Baltimore-Washington market. Pursuant to the study, BP ceased operating as a conventional dealer in the Baltimore-Washington market, and proceeded as follows:

1. BP and SOHIO sold one of BP's refineries, its trunk lines in Texas, and properties in Florida, Georgia and the Carolinas;

2. Presently operating high-volume stations and other potential high-volume sites were converted to gas and go stations;

3. Marginal stations were closed and others were operated under the William Penn logo owned by SOHIO; and

4. By letter of September 26, 1973, Charles King, Vice-President of BP, wrote to each of the plaintiffs and other BP dealers, advising them of the new marketing procedures, and cancelling each of their franchise agreements at the end of its term. Each cancellation was timely under the terms of the corresponding contract. BP also presented each of the dealers certain alternatives:

1. becoming BP employees as "I-Managers" of gas and go stations;

2. becoming William Penn dealers; or

3. leaving BP.

Each of the plaintiffs signed a new contract sometime between April and July of 1973. They claim that they were induced to enter into these agreements by the continuing promise that if they did not violate any provisions of the agreements, they could "operate their stations forever." Under Count IV, plaintiffs allege that the defendants' representations were fraudulent insofar as the plaintiffs were induced to enter into franchise agreements by the promise of continuing contracts when the defendants never intended to stand by these promises.

## DIRECTED VERDICT ON COUNT I

Count I incorporates two theories of recovery, both based on antitrust law. The first theory is that BP and SOHIO conspired, combined or contracted with dealers vertically to refuse to deal with the plaintiffs in furtherance of a marketing scheme by which BP would fix the price of gasoline at gas and go stations. The second theory of recovery under

Count I is that BP and SOHIO conspired horizontally with each other and with other major marketers of gasoline to alter BP's share of the market and to fix prices at gas and go stations. Both forms of conspiracy allegedly constituted unreasonable restraints of trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1 (1970).

The antitrust count fails in two respects. First, the plaintiffs failed to prove that a conspiracy existed, either horizontally or vertically. Second, even if a conspiracy had existed, plaintiffs failed to show that the outcome of the conspiracy had any anticompetitive effect constituting a restraint of trade in violation of the Sherman Act.

## HORIZONTAL CONSPIRACY

■ The plaintiffs have failed to show even a scintilla of proof that either SOHIO or BP made any agreement on any matter with any other oil marketer. A more difficult problem arises because certain agreements were shown between BP and SOHIO.

The weight of authority is to the effect that affiliated corporations within a single commonly-owned enterprise are separate entities capable of conspiring with each other in violation of the Sherman Act. This is called the "bathtub" or "intra-enterprise" theory of conspiracy. There seems to be general, although not enunciated support for this proposition in Supreme Court cases.

In *United States v. Yellow Cab Co.*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), a company was formed which acquired complete or controlling interests in major taxicab companies and which therefore dominated the ownership of taxi licenses in many major cities. The companies then agreed to control the operation and purchase of cabs in those cities. The affiliated companies argued that they operated within a neutrally integrated enterprise which

would prevent any agreement between them from being a conspiracy. The Court disagreed, stating:

. . . [A]n unreasonable restraint on interstate commerce . . . may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent. . . . The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act.

332 U.S. at 227, 67 S.Ct. at 1565.

In *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the Supreme Court held that since a parent and subsidiary had availed themselves of the privilege of doing business as separate corporations, the fact of common ownership could not save them from any of the obligations imposed by the law on separate entities. *Id.* at 141–42, 88 S.Ct. 1981, *citing Timken Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).[1]

Nevertheless, there is certain persuasive authority which holds that a parent and subsidiary cannot conspire in violation of Section One of the Sherman Act *if they are not in actual competition in the market. See Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 n.1 (3d Cir. 1972); *United States v. Arkansas Fuel Oil Corp.*, 1960 Trade Cas. ¶ 69,619 (N.D.Okl.1960); *contra, TV Signal Co. v. Am. Tel. & Tel. Co.*, 462 F.2d 1256, 1260 (8th Cir. 1972); *Tamaron Distrib. Corp. v. Weiner*, 418 F.2d 137, 139 (7th Cir. 1969).

Common sense dictates the conclusion that where conspirators are *not* competitors in the market in which prices are allegedly being fixed, *and* there is horizontal competition in that market, then no harm can be done, and therefore no

---

1. *See also Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Schine Chain Theatres, Inc. v. United States*, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948).

restraint of trade can be accomplished by, an agreement to refuse to deal or to fix prices.[2]

Plaintiffs, with the burden of proving the existence of a conspiracy, failed to show that BP and SOHIO are in competition in the market, *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir.), *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965), and a directed verdict on the horizontal aspect of the antitrust count was granted.

## VERTICAL CONSPIRACY

■ Plaintiff also failed to prove the existence of a vertical conspiracy. BP and SOHIO did not enter into any agreements with independent dealers to fix prices or to refuse to deal with the plaintiffs. Nor were the plaintiffs forced to become unwilling participants in a scheme which violated the antitrust laws. *See, e. g., Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Albrecht v. The Herald Co.*, 390 U.S. 145, 150 n.6, 88 S.Ct. 869, 19 L.Ed.2d 998; *Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Phillips v. Crown Central Petroleum Corp.*, 395 F.Supp. 735, at 760–764 (D.Md.1975).

BP cannot be said to have conspired with those dealers who became I–Managers, for a corporation cannot conspire with itself or with its own employees, *Goldinger v. Boron Oil Co.*, 375 F.Supp. 400, 406 (W.D.Pa.1974).[3]

Since plaintiffs have failed to show that a conspiracy existed, an essential element of the cause of action under Section One of the Sherman Act is missing, and a verdict should be directed on Count I of the complaint.

Even assuming that a conspiracy could be shown, however, the plaintiffs did not tender evidence establishing a violation of the antitrust laws.

The substance of the complaint under Count I is that BP and SOHIO engaged in a concerted refusal to deal with the plaintiffs and other dealers in furtherance of a price fixing scheme. The plaintiffs cite *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964) and *Osborn v. Sinclair Refining Co.*, 324 F.2d 566 (4th Cir. 1960) in support of the illegality of this refusal to deal.

*Osborn* merely establishes the fact that although a concerted refusal to deal, without any more, is legal, *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), if a refusal to deal is in furtherance of a scheme such as price fixing which is in violation of the antitrust laws, the refusal to deal is also in violation of the antitrust laws, *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

A violation of the antitrust laws could therefore exist if there were a price fixing arrangement, or, if, absent price fixing, there were a refusal to deal which was otherwise in violation of the antitrust laws.

## PRICE FIXING

■ It has long been held that conspiracies to fix prices are illegal *per se* as unreasonable restraints of trade under Section One of the Sherman Act, wheth-

---

2. At least one authority, Willis & Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries*, 43 N.Y.U.L.Rev. 20, 35 (1968) argues that to allow affiliated corporations not in competition with each other to constitute a conspiracy would discourage corporations from decentralizing corporate management, which they would normally do for reasons which have nothing to do with market considerations. The article suggests that the intra corporate conspiracy theory be utilized only when the parent and subsidiary publicly adopt

a competitive posture à la *Kiefer-Stewart*, or the parent does business through subsidiaries and uses the subsidiaries to produce anti-competitve effects à la *Yellow Cab*. *Id.* at 35. Neither of these conditions is present in this case.

3. On whether I–Managers were employees of BP or independent dealers, *see* the discussion of *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), *infra*.

er the conspiracy be horizontal, *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), or vertical, *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (maximum price set); *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (maximum price set).

Before moving on to the refusal to deal, therefore, it must be determined whether the system of distribution which presently exists, that is, sale through I-Manager stations, constitutes a scheme to fix prices in light of *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964). In *Simpson*, Union Oil had a consignment agreement with its dealers. The agreement was for a one-year term, at which time either party could terminate the relationship. The agreement was issued in conjunction with a lease of the station property. Prices were set by Union. Title to the gas remained in the company until sold by the dealer, and the company paid taxes on all gasoline. The dealer was required to carry personal liability insurance and property damage insurance and held the risk of loss on goods. The dealer, paid by a minimum commission, paid all costs of operation. The Supreme Court held that price fixing by Union Oil had an anti-competitive effect and was hidden by the consignment agreement in which each dealer was actually an independent businessperson who carried the risks of the station business.[4]

■ Although there was a good deal of argument on the subject by counsel in this case, plaintiffs introduced no evidence by testimony or exhibits to prove that the I-Manager relationship was not one of employer/employee. To the contrary, the only evidence on the part of the plaintiffs tended to show that the individual plaintiffs did not want to become I-Managers because they felt that they would have to sacrifice their status as independent business persons to become employees of BP who had little or no say in the running of the stations.

Price fixing was not shown for the same reason that a conspiracy was not shown; plaintiffs failed to prove that there were two separate and independent parties capable of conspiring with each other in order to fix prices. A company may, of course, own and operate its own stations, and may set its own retail prices without violating the antitrust laws. *See Phillips v. Crown Central Petroleum*, at 761 (D.Md.1975).

### THE REFUSAL TO DEAL

Assuming that there was no agreement to fix prices, it remains to be determined whether the defendants' refusal to deal with the plaintiffs violated the antitrust laws. This case is clearly parallel to *Knutson v. The Daily Review, Inc.*, 383 F.Supp. 1346 (N.D.Cal.1974).

In *Knutson*, the plaintiffs were independent dealers who purchased, distributed and resold daily newspapers. The defendants were newspaper publishers. Originally, the plaintiffs acted as independent dealers who bought the papers outright from the publishers and thereafter took the risks of distribution and sale of the papers. The defendants attempted to set subscription prices which the independents could charge, and the dealers acquiesced in charging the prices suggested by the publishers. When the plaintiff dealers complained that the price fixing and certain territorial restraints were anticompetitive and therefore illegal, the defendants terminated their contracts with the plaintiffs in order to institute their own in-house distributing scheme. Each plaintiff was offered a job as a salaried district manager. The plaintiffs refused these posi-

---

4. *Simpson* narrowed the case of *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), to its facts. There a simple agency agreement existed between a salesperson and the company and the fixing of the retail prices was held lawful.

tions and contested the change in the distributional scheme under the antitrust laws.

The court held that there had been price fixing under the independent dealership arrangement, but that the defendants were warranted in terminating the independent distributors. First, the court held that since the change in market procedure had been made by one man who controlled all of the defendant companies, there could be no contract combination or conspiracy. *Id.* at 1358–59. Nevertheless, the court went on to hold that even if there had been a conspiracy, the decision to change the papers' scheme of distribution was the product of good economic sense and a desire to operate within the antitrust laws. The court stated that:

> . . . a manufacturer does not violate the antitrust laws simply by discontinuing his dealings with a particular distributor. . . . Nor is a manufacturer forever bound to use the same system of distribution when sound business considerations suggest that a different method be used. Thus, a manufacturer can lawfully terminate an independent distributor and thereafter sell exclusively through its own outlets. *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir. 1972); *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972).

383 F.Supp. 1360–61.

The court recognized the interest of the publishers in having a uniform subscription price since it facilitated promotion of the paper and avoided subscriber hostility:

> The Court finds credible [the publisher's] testimony that his decision was made to ensure that his businesses were in full compliance with the law and to maintain simultaneously the greatest degree of influence which the law would allow over all aspects of the circulation of the newspapers, including not only influence over the subscription price but also over the frequency of publication,

method of payment [and] type of distribution . . . . [The publisher] desired influence in these areas in order to meet the competition [and to] preserve the financial integrity of the newspapers.

*Id.* at 1364.

■ In spite of the sense of the publisher's decision, the existence of sound business reasons alone was not sufficient to satisfy the court that no unlawful restraint had occurred; a mere refusal to deal which was the product of sound business sense would only be lawful as long as no substantial anticompetitive effect or unreasonable restraint of trade was a result. *Id.* at 1365, *citing United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 375, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). Determining whether such results occurred or were intended requires a "consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption." *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The court held, however, that the plaintiffs in *Knutson* had not proved anticompetitive impact or effect on the market place, especially considering the "generous offer of employment which accompanied the termination notice and the speculative value of [the] businesses . . . ." 383 F.Supp. at 1365. The court held also that the plaintiffs failed to prove that the scheme enhanced an already dominant market position because they had failed to identify the relevant product and geographic markets. *Id.* at 1366, *citing United States v. Grinnell Corp.*, 384 U.S. 563, 571–76, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), and *United States v. duPont & Co.*, 351 U.S. 377, 393–400, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (Section 2 relevant market cases).

The logic of *Knutson* is irrefutable regarding the lawfulness of termination of independent dealers in an effort to change a scheme of distribution which

in turn is a response to economic and legal realities. *See also, Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969); *cert. denied*, 396 U.S. 1072, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Bushie v. Stenocord Corp.*, 460 F.2d 116 (9th Cir. 1972); *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093 (3d Cir. 1972).

The case at hand is strikingly parallel to *Knutson*. BP could not fix prices at its independent stations and it faced severe economic losses should it continue its present distributing scheme. It therefore chose to adopt a system whereby it could regulate method of distribution and price lawfully in an effort to operate at a profit. "Gas and go" was the result. It was a distributional scheme which was the product both of good economic sense and a desire not to run afoul of the antitrust laws.

The plaintiff failed entirely in its burden of proving anticompetitive effect. There was no testimony tending to show the relevant geographic market, BP's position in that market, or the effect of the change in distribution of a relevant product on that market. Nor was there a showing that "gas and go" hampered competition; in fact "gas and go" conformed BP's marketing stance to the high-volume/low-price position already adopted by other competitors. The result was, if anything, beneficial to the consumer in the form of lower prices.

Even taking all evidence in the light most favorable to the plaintiffs, as the Court is required to do on a motion for directed verdict, the Court concludes that there are no controverted issues of fact upon which reasonable people could differ, *Pogue v. Retail Credit Co.*, 453 F.2d 336, 338 (4th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 910, 34 L.Ed.2d 689 (1973), and that a verdict should be directed in favor of the defendants on Count I of the complaint.

## JUDGMENT NOTWITHSTAND-ING THE VERDICT

■ The standard for granting a judgment notwithstanding a verdict under Fed.R.Civil P. 50 is the same as the standard for granting a motion for a directed verdict. *Hawkins v. Sims*, 137 F.2d 66, 67 (4th Cir. 1943). The test for denying a directed verdict motion, in turn, is, viewing the evidence in the light most favorable to the party against whom the motion is made, and giving that party the benefit of all reasonable inferences which arise from the evidence, where there is evidence upon which a jury could reasonably find a verdict for that party. *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 167 (4th Cir.), *cert. denied*, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957).

■ Reviewing the evidence and the inferences drawn therefrom in the light most favorable to the plaintiffs, it is clear that there was enough evidence in the plaintiffs' favor to submit the case to the jury and to prevent a directed verdict in the defendants' favor.

Defendants have moved for a judgment notwithstanding the jury's verdict on Count IV on two grounds. Defendants claim first that there was insufficient evidence on which the jury could have found that the plaintiffs had a right reasonably to rely on Taggart, BP's sale's representative, in light of the integration clause in the contract which allegedly put the plaintiffs on notice that they could not rely on oral representations outside the contract.

To the contrary, there was sufficient evidence for the jury to find not only that Taggart had actual authority to make these representations, but that the representations were fraudulent, thus vitiating the contract and its integration clause.

Taggart, who negotiated lease agreements with the plaintiffs, testified that at the training school for BP sales rep-

resentatives, he and other dealers were told by one Jackson that dealers would probably object to short-term leases. To meet these objections, Jackson said, sales representatives should tell prospective dealers that if they conformed to the conditions of their leases, they could stay on "forever" at their stations. Taggart also stated that he told his District Manager, Mark Baltes, of these representations. Jerry Southern, another sales representative who dealt with some of the plaintiffs, stated that Taggart and the other sales representatives were told that they had a free hand in negotiations with dealers. There was therefore sufficient evidence that the BP representatives were given authority to make such representations.

■ There was also evidence that the plaintiffs could and did rely on the assurances, although some of the plaintiffs had other reasons for becoming BP dealers. Nevertheless, a fraudulent representation may be one of several reasons for action, and need not be the sole cause as long as there is some reliance on the misrepresentation. *Savings Bank Retirement Sys. v. Clarke*, 258 Md. 501, 507, 265 A.2d 921, 924 (1970). Since fraud renders a contract void, proof of actionable fraud as defined by the case law, *see, e. g., Appel v. Hupfield*, 198 Md. 374, 84 A.2d 94 (1951), would render the contract, and therefore the integration clause, irrelevant. BP's course of dealing over the years, the lack of education on the part of some of the plaintiffs, the language barrier in some cases, the perfunctory manner in which the contracts were handled, and the difference in bargaining power between the plaintiffs and the defendants all support the inference that the assertions made by Taggart to the plaintiffs constitute fraudulent misrepresentations on which the plaintiffs had a right to rely. *See BP Oil Corp. v. Guise*, No. 73–4417 (Ct.Com.Pl.Munt.Co.Pa.1974).

■ Defendants' second ground for judgment n. o. v. is that the evidence did not show that the plaintiffs' reliance on the defendants' fraudulent statements was a proximate cause of their injury. As plaintiffs correctly indicate in their memorandum in opposition to the motion for judgment n. o. v., defendants mistake the nature of damages recoverable in a case where fraud is shown. Plaintiffs relied on fraudulent misrepresentations that their contracts would be perpetually renewed as long as they performed their side of the franchise contract. Once that contract was voided by fraud, the party injured was deprived of the benefit of the contract into which he supposedly entered. In this case, the plaintiffs are being deprived of their franchise stations and are entitled to the "benefit of the bargain" which they made, or the future earnings which they could reasonably have made had BP performed its end of the contract. *See Hinkle v. Rockville Motor Co., Inc.*, 262 Md. 502, 511–13, 278 A.2d 42, 47 (1971). *See also Downs v. Reighard*, 265 Md. 344, 289 A.2d 299 (1971).

The loss of anticipated earnings was therefore proximately caused by the fraudulent misrepresentation. The extent of this loss is not speculative, for there was a lengthy prior relationship between the plaintiffs and the defendants on which an appropriate measure of damages could be based.

### NEW TRIAL

■ On a motion for a new trial under Fed.R.Civ.P. 59, a verdict may be set aside and a new trial granted when a new trial would be in the interest of justice, *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 352 (4th Cir. 1941). The burden of showing error at trial warranting a new trial rests on the party seeking a rehearing of the merits. 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil § 2083, at 32 (1973).

The claim that the jury's verdict was against the weight of the evidence was dealt with above, and needs no additional elaboration. The verdict will stand on the issue of liability.

On the question of damages, however, a new trial is warranted. The Court is satisfied that the issues of liability and damage are not so inextricably interwoven that a partial new trial on the issue of damages alone could not be had. *See Gasoline Products Co. v. Champlin Co.*, 283 U.S. 494, 51 S.Ct. 76, 75 L.Ed. 735 (1931); *Young v. International Paper Co.*, 322 F.2d 820 (4th Cir. 1963); *Mason v. Mathiasen Tanker Ind., Inc.*, 298 F.2d 28, 32–33 (4th Cir.), *cert. denied*, 371 U.S. 828, 83 S.Ct. 23, 9 L.Ed. 2d 66 (1962); *Great Coastal Express, Inc. v. International Brotherhood of Teamsters*, 511 F.2d 839 (4th Cir. 1975); C. Wright and A. Miller, Federal Practice and Procedure, Civil § 2814, at 93 (1973).

■ Although a court is not free to set aside a verdict simply because the court would have awarded a different amount of damages than the jury, it is the duty of the trial court to grant a new trial when confronted with an excessive verdict, *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350 (4th Cir. 1941); *Casale v. Dooner Lab., Inc.*, 343 F.Supp. 917, 918 (D.Md.1972), *aff'd in part, reversed in part on other grounds*, 503 F.2d 303 (4th Cir. 1973), or when the verdict shocks the conscience of the court, *Casale v. Dooner Lab., Inc.*, 343 F.Supp. 917, 919 (D.Md.1972).

As stated by the late Chief Judge Parker:

"The power and the duty of the trial judge to set aside the verdict . . . is well established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right. . . .

"To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require."

*Virginia Railway Company v. Armentrout,* 166 F.2d 400, 408 (4th Cir. 1948).

■ But a new trial is not the only relief available to a party who suffers under an excessive verdict. The principle of remittitur is ancillary to the right of the trial judge to grant a new trial under such circumstances. Although the Court may not deprive the right of the parties to a jury trial under the Seventh Amendment, a remittitur may be assessed in an amount that will bring the verdict on damages to the maximum amount which the jury could have awarded under the evidence introduced at trial. 11 C. Wright and A. Miller, Federal Practice and Procedure, Civil § 2815, at 104–05 (1973), thus affording the plaintiffs an opportunity to make a remittitur or to accept a new trial if the plaintiffs do not consent to a remittitur.

■ The Court is satisfied that the awards of damages are grossly excessive and shocking to the conscience. A careful review of the evidence on damages shows it to be too vague and speculative to warrant damages in the excessive amounts awarded by the jury. The expert called by the plaintiffs projected damages for periods of three to nine years, rejecting the views expressed by the plaintiffs themselves that, under prior—but similar—leases, they could "get out" of the lease at its termination by giving a short notice. The testimony shows the transitory nature of gasoline station leases, and a projection of a lease of periods up to nine years is out of touch with reality. Nor is there any basis in fact for the testimony of the plaintiffs' expert relating to an adjustment for 1974 earnings.

The plaintiffs are entitled to payment for investment in stock and equipment and for earnings for two years—the

maximum reasonable amount which could have been awarded by the jury.

Accordingly, it is this 22nd day of October, 1975, by the United States District Court for the District of Maryland, Ordered:

1. That the defendants' motion for a directed verdict on Count I of the complaint be, and the same is, hereby granted;

2. That the defendants' motion for a judgment notwithstanding the verdict be, and the same is, hereby denied;

3. That the defendants' motion for a new trial on the issue of liability on Count IV of the complaint be, and the same is, hereby denied; and

4. That the verdict of the jury on the issue of damages only in favor of the plaintiffs herein and the judgment entered thereon on May 5, 1975, be set aside and a new trial awarded on the issue of damages only, unless within fifteen (15) days of the date of this Order the plaintiffs file a remittitur of all sums in excess of the amounts set forth after the name of the plaintiffs listed hereunder:

| | |
|---|---|
| Call Carl, Inc. | $ 47,497.00 |
| Francisco Diaz & Avelino Pestana t/a Piney Branch BP Service Station | 21,799.00 |
| Remo Gage t/a Gage's Service Center | 11,757.00 |
| Hoyt M. Smith t/a Smitty's BP | 99,653.00 |
| Robert Cochrane, Sr., t/a Cochrane's Shady Grove BP | 50,550.00 |
| R. Wayne Loekle t/a Manor BP | 83,927.00 |
| William Luksenburg t/a Twinbrook BP | 85,432.00 |
| Robert DeLeonibus D & D Service | 125,246.00 |
| Richard L. Stickell t/a Dick's BP | 50,949.00 |
| Melvin D. Sherbert t/a Queenstown BP | 27,022.00 |