J.C. HOLMAN, t/h/o/u and t/u/o Liberty Mutual Insurance Company and Ann Holman, Plaintiffs,

v.

MARK INDUSTRIES, INC. and Patuxent Equipment Company, Defendants.

Civ. No. H–82–768.

United States District Court, D. Maryland.

March 22, 1985.

James M. Gabler, Sandbower, Gabler & O'Shaughnessy, Douglas B. Schoettinger, Smith, Somerville & Case, Baltimore, Md., for plaintiffs.

James E. Gray and Thomas M. Gross, Semmes, Bowen & Semmes, Baltimore, Md., for defendant Patuxent Equipment Co.

Donald C. Allen and Thomas J. Scheltelich, Allen, Thieblot & Alexander, Baltimore, Md., for defendant Mark Industries, Inc.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, District Judge.

This civil action came on for trial before a jury commencing on January 9, 1985. The trial lasted for some three weeks, and on January 31, 1985, the jury returned a verdict against both defendants Mark Industries, Inc. (hereinafter "Mark") and Patuxent Equipment Company (hereinafter "Patuxent"). The award in favor of plaintiff J.C. Holman was in the amount of $1,400,000 and the award in favor of plaintiffs J.C. Holman and Ann Holman his wife was in the amount of $180,000. Final judgments were duly entered by the Court on these verdicts on January 31, 1985.

Presently before the Court are post-trial motions filed by both defendants. Defendant Patuxent has filed a motion for a partial new trial on the issue of damages. In the alternative, defendant Patuxent seeks the entry of an Order by this Court requiring plaintiffs to file a remittitur in an amount which would reduce the damage awards for the plaintiffs to a reasonable amount. Pursuant to Rule 50(b), F.R. Civ.P., defendant Mark has filed a motion for judgment notwithstanding the verdict.

Memoranda in support of and in opposition to these motions have been filed by the parties and reviewed by the Court. A hearing was held in open court on these motions on April 19, 1985.

## I

### Background

Plaintiff, J.C. Holman, a 60-year old carpenter, was employed on the morning of May 20, 1981 by James Julian, Inc., (hereinafter "Julian"), a contracting firm engaged in the construction of an extension of Interstate 95 in the City of Baltimore. On the day in question, plaintiff Holman was working on a self-propelled aerial lift owned by defendant Patuxent and leased to Julian, plaintiff's employer. The lift, known as an RT–40 Parker Scissors Lift, had been manufactured by defendant Mark and sold by it in 1977 to a machinery company which in turn sold the lift in 1980 to defendant Patuxent. In order to perform his work that morning, Holman had ascended on the platform of the lift to a height of between 35 and 40 feet. Suddenly, the platform tilted and fell forward from that height throwing Holman to the ground and causing the injuries for which he sought recovery in this suit. Holman sued to his own use and to the use of Liberty Mutual Insurance Company which had paid him workmen's compensation benefits. Holman sought recoveries from both defendants for medical and hospital expenses, lost earnings, pain and suffering and for the permanent injuries sustained by him in the accident. Holman's wife Ann joined him in this suit in asserting a joint claim for loss of consortium.

The plaintiffs alleged claims against both defendants based upon three separate legal theories, namely breach of warranty, negligence, and strict liability in tort. At the close of the plaintiffs' case, this Court directed a verdict in favor of defendant Mark as to plaintiffs' claim against Mark based on the theory of breach of warranty and also as to their claim against Mark based on a theory of strict liability in tort. In its charge, the Court instructed the jury that the only claim that it could consider against defendant Mark was plaintiffs' contention that the machine had been negligently designed.

The case was presented to the jury under Written Interrogatories. In answering the Interrogatories, the jury specifically found that defendant Patuxent was liable under all three of the legal theories relied upon by the plaintiffs in seeking recoveries from the defendant. The jury found that defendant Patuxent was liable for breach of warranty, that defendant Patuxent was negligent and that defendant Patuxent was strictly liable in tort. In addition, the jury concluded that Patuxent's breach of warranty, negligence and strict liability were proximate causes of the injuries sustained by plaintiff Holman on May 20, 1981. The jury also found that defendant Mark was negligent in its design of the machine involved in the accident and that such negligence was also a proximate cause of Holman's injuries. Pursuant to its responses to these Written Interrogatories, the jury found for the plaintiffs against both defendants, jointly and severally, and awarded damages of $1,400,000 to plaintiff J.C. Holman individually and damages of $180,000 to plaintiffs J.C. Holman and Ann Holman jointly.

## II

### The Applicable Legal Principles

■ The standard for granting a judgment notwithstanding the verdict under F.R.Civ.P. 50(b) is the same as the standard for granting a motion for a directed verdict. *Hawkins v. Sims,* 137 F.2d 66, 67 (4th Cir.1943). In ruling on a motion for a directed verdict, the trial court must consider the record as a whole, viewing the evidence in the light most favorable to the party against whom the motion is made and giving that party the benefit of all reasonable inferences which arise from the evidence. If there is substantial evidence upon which a jury could reasonably find a verdict for the nonmoving party, the motion should be denied. *Mays v. Pioneer Lumber Corp.,* 502 F.2d 106, 107 (4th Cir. 1974); *Ralston Purina Company v. Edmunds,* 241 F.2d 164, 167 (4th Cir.), *cert.*

*denied,* 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957). The movant is not entitled to prevail if, based on the applicable law, the evidence presented at trial raises questions upon which reasonable minds may differ. *See Harner v. John McShain, Inc.,* 394 F.2d 480 (4th Cir.1968). However, speculative or conjectural inferences are not sufficient to support a jury verdict. *Business Development Corporation of North Carolina v. United States,* 428 F.2d 451, 453 (4th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 266 (1970).

On a motion for a new trial under F.R.Civ.P. 59(b), a verdict may be set aside and a new trial granted when it would be in the interest of justice. *Aetna Casualty & Surety Company v. Yeatts,* 122 F.2d 350, 352 (4th Cir.1941). A motion for a new trial is addressed to the sound discretion of the trial court. *See Richmond v. Atlantic Company,* 273 F.2d 902 (4th Cir.1960). The burden of showing error rests on the party seeking a rehearing on the merits. 11 C. Wright and A. Miller, *Federal Practice and Procedure, Civil* § 2803, at 32 (1973).

### III

*The Motion of Defendant Mark for Judgment Notwithstanding the Verdict*

In seeking the entry of a judgment in its favor notwithstanding the verdict, defendant Mark contends that the evidence presented at the trial was insufficient both as to the issue of Mark's negligence and as to the issue of proximate cause. Mark asserts that plaintiffs did not produce sufficient evidence that the lift was defectively designed by Mark or sufficient evidence that any defective design was the proximate cause of plaintiff's injuries for those issues to have been presented to the jury. At the close of the plaintiff's case, defendant Mark had moved for a directed verdict as to all of the claims asserted against it by plaintiffs. After hearing argument at that stage of the trial, the Court agreed that plaintiffs had not presented sufficient evidence to support the claims of breach of warranty and strict liability in tort asserted by them against defendant Mark. However, the Court denied the motion insofar as plaintiff's claim of negligent design was concerned and permitted only that one claim against Mark to be presented to the jury.

After considering the post-trial memoranda filed by the parties and after a further review of the entire record in this case, including the exhibits, and of the Court's trial notes, this Court concludes that the motion of defendant Mark for judgment notwithstanding the verdict should be granted. The Court is satisfied that substantial evidence does not exist in this record whereby the jury could return a verdict for plaintiffs against defendant Mark based on a theory of negligent design.

The last contact that defendant Mark had with this RT–40 Scissor Lift machine was in 1977. The machine had been manufactured by Mark and was sold to Bublitz Machinery Company of Kansas City on July 30, 1977. Subsequently, it was sold to Patuxent on May 14, 1980 and later leased by Patuxent to Julian in May of 1981. No evidence was presented to indicate that Mark ever inspected, repaired or serviced the machine during the nearly four years between the time it left its possession and the date of the accident on May 20, 1981. Thus, what must be determined is whether the machine as it existed on July 30, 1977 had been negligently designed and whether any such negligence was the proximate cause of the accident.

The evidence presented at the trial discloses that this secondhand machine was in deplorable condition when the accident occurred on May 20, 1981. As designed and manufactured by Mark, the work platform of the RT–40 could be raised to a height of 40 feet. Numerous safety devices had been included by Mark in its design of the machine to prevent accidents such as this one from occurring. By May 20, 1981, almost every one of these safety devices had been altered, removed or bypassed in some way. As a result of the jury's findings that Patuxent was responsible in dam-

ages to plaintiffs under three separate theories of liability, it is apparent that the jury was satisfied that Patuxent alone was solely responsible for the deplorable condition of this machine on May 20, 1981. Abundant evidence in the record supports these findings.

First, there was a tilt-switch assembly made up of mercury switches which would prevent the lift from being raised if on unstable ground and which would cause the work platform to descend automatically if the machine moved onto unstable ground after the platform had been raised. This device was not operating on the date of the accident because the switches had been removed and the assembly bypassed. Next, there was a limit switch assembly attached to one scissor arm, also composed of mercury switches. This device was designed to prevent the platform from being raised without outriggers being in place, to prevent the machine from being driven under certain circumstances and to activate the tilt switch assembly at a height of 12 feet or more. The limit switch assembly was not operative on the date of the accident because the mercury switches had been removed and the entire assembly had been overridden or bypassed. Thirdly, there was a warning light on the control box located on the platform where plaintiff Holman was standing shortly before the accident happened. This light was designed to alert the operator when, with the platform raised, the machine was tilted or became tilted at an angle of more than six degrees fore and aft. This warning light was not operating on May 20, 1981 because it had been bypassed and the switches to which it was connected had been removed.

The evidence further indicates that Mark, the manufacturer, had provided various written warnings and instructions for operators of the machine. A number of warning decals concerning the proper operation of the machine and its care and maintenance had been placed by Mark on the RT-40. However, they were not readable on May 20, 1981 because they had been painted over and were in a state of disrepair. In particular, instructions and warnings had been placed on the operator's control box located on the platform. These likewise had been painted over or were otherwise unreadable.

The most significant change in the condition of the machine occurring after it was last in the possession of Mark involved one of the four rails which formed a part of the construction of the RT-40. Two steel rails were located along the undercarriage of the machine while two additional rails were located at the top and connected to the platform. Two wheels with center pins rode along the frame of the undercarriage of the machine. As the wheels came forward, the platform was raised. The lower rails were constructed with channels, each of which had a U-shaped lip designed to capture and retain the pins running through the wheels if the machine tilted forward and the wheels lifted up off their tracks. As a result of this design, the chassis of the RT-40 served as an anchor in the event that all other safety devices failed or were inoperable and the platform, being in an unstable position, began to tip.

It is undisputed in this case that the lower right roller rail was very substantially deformed on May 20, 1981. The deformation of this steel member extended for some 36 to 39 inches. The curved portion of the top of that rail had been folded outward and flattened out so that it was level with the ground. As indicated by the rusted metal, this was old damage. The deformation of the metal began essentially near the back of the chassis at the starting point of the platform as closed and extended all the way to a position that corresponded with a 35-foot extension of the platform. Had this substantial deformation not been present, the accident would not have happened. Every witness who testified concerning this aspect of the case agreed that the rail as manufactured by Mark would have captured the pin and prevented the accident. It is likewise clear that Mark was not in any way responsible for the deformation, since the machine had left its possession almost four years before the accident.

The record here is replete with evidence indicating that this machine had not been properly maintained, inspected or repaired by defendant Patuxent and that on May 20, 1981 it was unsafe in many respects. Indeed, as a result of the substantial evidence presented by the plaintiffs concerning the condition of the machine on the date of the accident, the jury found that defendant Patuxent was at fault in three different respects. The jury found that defendant Patuxent was liable for breach of warranty, that it was negligent at or about the time of the accident and that it was strictly liable in tort on or about May 20, 1981. The jury further found that each such fault was a proximate cause of the injuries sustained by plaintiff Holman.

The theory of liability asserted against defendant Mark is that Mark's negligence, although occurring more than four years before the accident, was the concurrent cause of plaintiff's injuries. It is asserted that the accident would not have happened if the lower right roller rail had not been substantially deformed, that such deformation was reasonably foreseeable by Mark and that Mark was negligent in not designing a rail which would withstand the 36 to 39 inch deformation existing on the morning of the accident.

On the record here, this Court concludes as a matter of law that there was not substantial evidence at the trial whereby the jury could find either that defendant Mark negligently designed the machine or that any such negligence of Mark was the proximate cause of the accident. The substantial deformation of this rail, which occurred at some time during the 46 months that elapsed after the machine left Mark's possession, resulted from an abnormal misuse of the machine which could not have been foreseen by Mark. Moreover, Mark could not have foreseen that the machine would be used in such a damaged condition for normal operations, with deformation of the rail extending over a length of more than 3 feet and consisting of rusted and bent metal of this operating component of the machine. What is lacking here then is sufficient evidence of foreseeability on the part of Mark, an essential element both of negligent design and of proximate causation.

### (a) Negligence

■ A manufacturer does not insure its product and is not required to make its product accident proof or to design the safest possible machine. *Volkswagen of America, Inc. v. Young*, 272 Md. 201, 217, 321 A.2d 737 (1974); *Frericks v. General Motors Corporation*, 274 Md. 288, 295, 336 A.2d 118 (1975). Rather, the duty assumed by a manufacturer is to design the product for its intended use, namely that use which could reasonably be foreseen. *Young, supra* 272 Md. at 216, 321 A.2d 737. Both plaintiffs and defendant Patuxent assert that Mark should have foreseen the risk of deformation of the type that occurred here and should have designed the rail to have been manufactured with stronger steel and also with a longer pin. Had that been done, these parties argue, either the deformation of the rail would not have occurred or the damaged rail would still have captured the pin. Under either of these circumstances, it is contended that the rail would have captured the pin and the machine would not have tipped over.

■ Although it is not necessary that the manufacturer foresee the exact manner in which an accident occurs, there is no liability for damage that falls outside the general danger area. *Moran v. Faberge*, 273 Md. 538, 551–553, 332 A.2d 11 (1975), quoting from *Harper, A Treatise on the Law of Torts* § 7 (1933). Once the product is used outside this "general field of danger," the manufacturer is not liable if it neither foresaw nor should have foreseen the severity of the harm or the exact manner in which it occurred. *Moran v. Faberge, supra* at 552, 332 A.2d 11.

■ The question in a case such as this one is whether the actual harm (here the deformation of the rail) fell within a general field of danger which should have been anticipated. *Moran v. Faberge, supra* at 551, 332 A.2d 11, quoting from *Segerman v. Jones*, 256 Md. 109, 132, 259 A.2d 794 (1969). A use is not reasonably foreseeable when harm results because the product is

mishandled in a way which the manufacturer has no reason to expect or is used in some unusual or unforeseeable manner. *Restatement, Second, Torts* § 395, Comment j, cited with approval in *Moran v. Faberge, supra,* 273 Md. at 545, 332 A.2d 11.

On the record here, this Court concludes as a matter of law that the substantial deformation of this rail resulted from abnormal use and mishandling which could not have been reasonably foreseeable by defendant Mark. Although various witnesses speculated as to the possible cause of this substantial deformation, there was no credible testimony presented concerning what had actually occurred. However, the exhibits and testimony establish clearly that very substantial forces caused the distortion and deformation of this steel member over this length of some 36 to 39 inches. Although Mark might well have anticipated some slight bending or damage to this rail, it could hardly have anticipated within the general field of danger that this extensive deformation of its product would be brought about by an unknown party during use of the machine for the purpose for which it had been manufactured.

■ Moreover, there was a second and separate abnormal use of the machine which could not have been anticipated by Mark, namely its use by Patuxent or by plaintiff's employer Julian in its condition on May 20, 1981. Even were it to be assumed that Mark should have anticipated that this rail during normal use might be deformed over a length of more than three feet (an assumption which is not supported by the evidence in this case), Mark still could not have anticipated that the machine would have been later used with substantially all of the safety features inoperable and with the rail in this damaged condition. The fact that the damaged portion of this steel member was badly rusted indicates that the deformation in question occurred some time before the accident of May 20, 1981. Even the most cursory inspection of the rails would have disclosed the damaged member. It was an abnormal use of this product when this obviously damaged machine was leased by Patuxent to Julian and used by Julian for work at its maximum height of forty feet with other safety features inoperable. Since plaintiff's injuries resulted from this abnormal use of Mark's product, the harm fell outside a general field of danger which should have been anticipated by Mark.

■ The Court's conclusion that Mark as a matter of law was not negligent is consistent with the Court's ruling during the trial that Mark was not liable to plaintiffs under a theory of strict liability. Under § 402 A, *Restatement, Second, Torts,* a seller of an unreasonably dangerous product is subject to liability for physical harm thereby caused to the ultimate user only if the product reaches the user without substantial change in the condition in which it was sold. The seller is not liable when he delivers the product in a safe condition and subsequent mishandling or other causes make it harmful by the time it is used. *Phipps v. General Motors Corporation,* 278 Md. 337, 347, 363 A.2d 955 (1976); *see* § 402 A and Comment g. Since the facts here disclosed that plaintiff's injuries had resulted from mishandling and abuse of the machine after it left Mark's hands, the Court at the close of plaintiffs' case, granted the motion of defendant Mark for a directed verdict as to plaintiffs' claim based on a theory of strict liability.

The Court of Appeals of Maryland has agreed with those authorities which recognize "no practical difference" in the application of negligence principles from principles of strict liability in a case involving allegations of negligent design. *Volkswagen of America, Inc. v. Young, supra* 272 Md. at 221, 321 A.2d 737; *see also, Singleton v. International Harvester Company,* 685 F.2d 112, 115–116 (4th Cir. 1981). Since this machine was subjected to abnormal use and mishandling after it left the hands of Mark and since the accident would not have happened had the machine been in the condition in which it was sold by Mark in 1977, defendant Mark is not liable to plaintiffs either under a theory of strict liability or under a theory of negligent design.

### (b) *Proximate Cause*

Foreseeability is an essential element both as to negligence and as to proximate causation. *Segerman v. Jones, supra,* 256 Md. at 132–135, 259 A.2d 794. As discussed hereinabove, this Court has concluded that defendant Mark was not negligent because it could not have reasonably foreseen either the abnormal use which resulted in the earlier deformation of the rail or the abnormal use of the machine on May 20, 1981 in its abused and damaged condition. For similar reasons, any act or conduct of Mark occurring before the machine left its hands in 1977 was not, as a matter of law, a proximate cause of plaintiff's injuries because the accident was not a reasonably probable consequence of anything done or omitted by Mark.

Further analysis of the facts here indicates that there are other reasons why on this record plaintiffs' proof of causation was insufficient as to defendant Mark. There is little doubt that there may be more than one proximate cause of an injury since several negligent or wrongful acts may work together to cause the damage. *State v. Hecht Company,* 165 Md. 415, 169 A. 311 (1933). In this case, the alleged negligence of Mark occurred at a much earlier date than did the negligence and other fault of Patuxent. Thus, another question presented here is whether any negligence of Mark was broken by an intervening cause, namely the later fault of Patuxent.

To excuse a defendant guilty of earlier negligence, the intervening cause must be either a superseding or a responsible cause. *State v. Hecht Company, supra* at 421, 169 A. 311. In explaining the concept of "responsible cause," the Court in that case said the following (165 Md. at 421, 169 A. 311):

> It is a responsible one, if it is the culpable act of a human being, who is legally responsible for such act. The defendant's negligence is not deemed the proximate cause of the injury, when the connection is actually broken by a responsible intervening cause. But the connection is not actually broken, if the intervening event is one which might, in the natural and ordinary course of things, be anticipated as not entirely improbable, and the defendant's negligence is an essential link in the chain of causation.

On this record, even if it be assumed that Mark was negligent, any such negligence was broken by a responsible cause, namely the extensive fault of Patuxent. The intervening acts and omissions of Patuxent could not have been anticipated by Mark as not entirely improbable. Rather, the leasing of this machine by Patuxent to another in the deplorable condition in which it existed on May 20, 1981, was a highly improbable occurrence, and therefore not foreseeable or reasonably to have been anticipated. *See Palms v. Shell Oil Company,* 24 Md.App. 540, 332 A.2d 300 (1975). Accordingly, any negligence of Mark was not a proximate cause of this accident because the connection between it and plaintiff's injury was broken by an intervening cause, namely the extensive, later fault of Patuxent.

Some cases have analyzed facts such as those present here in terms of "active" as opposed to "passive" negligence. Thus, liability may not be imposed if the negligence of one person "is merely passive and potential while the negligence of another is the moving and effective cause of the injury." *Palms v. Shell Oil Company, supra* at 546–548, 332 A.2d 300; *Peterson v. Underwood,* 258 Md. 9, 16, 264 A.2d 851 (1970). In this case, the negligence and other fault of Patuxent was the immediate, moving and effective cause of plaintiff's injuries. Any fault on the part of Mark was merely passive and potential and could not on this record have been the proximate cause of the accident. Indeed, were this Court to have concluded that both defendants were at fault, Mark would have been entitled to indemnity from Patuxent because Mark's negligence would be passive and not as serious as the active negligence of Patuxent. *See Jennings v. United States,* 374 F.2d 983, 987 n. 7 (4th Cir.1967).

Plaintiffs have suggested that Mark was the actively negligent defendant, relying on

language in the *Jennings* opinion indicating that a negligent manufacturer might be required to indemnify another party found negligent because of a later failure to inspect and discover a defect in the manufactured article. 374 F.2d at 987 n. 7. But the facts of this case are quite different from those in *Jennings*. Here the fault of Patuxent was extensive and included a failure to discover damage caused by a party other than Mark. Not only was there no manufacturing defect in this case, but also the machine here had been leased with inoperable safety devices and with other obvious damage. Thus, the active negligence here was clearly that of Patuxent.

## IV

### *The Motion of Defendant Patuxent for a Partial New Trial on the Issue of Damages*

██ The post-trial motion filed by defendant Patuxent challenges only the amount of the damages awarded by the jury. In seeking a partial new trial solely on the issue of damages or in the alternative a remittitur, defendant Patuxent asserts that the amount of damages awarded is so grossly excessive that a new trial should be ordered. As noted, the jury returned aggregate verdicts of $1,580,000, awarding $1,400,000 to plaintiff J.C. Holman individually and $180,000 to the plaintiffs jointly for loss of consortium.

In *Virginian Railway Company v. Armentrout,* 166 F.2d 400 (4th Cir.1948), the Court, in an opinion by the late Chief Judge Parker, held that the trial judge had abused his discretion in not granting a new trial on the ground that the verdict was excessive. In discussing the applicable principles in a case such as this one, Chief Judge Parker said the following (at p. 407):

> Ordinarily of course, the amount of damages is for the jury and whether a verdict should be set aside as excessive is a matter resting in the discretion of the trial judge. This, however, is not an arbitrary but a sound discretion, to be exercised in the light of the record in the case and within the limits prescribed by reason and experience; and where a ver-

dict is so excessive that it cannot be justified by anything in the record or of which the Court can take judicial notice, it is the duty of the judge to set it aside. Failure to do is an abuse of discretion, analogous to error of law, and as such reviewable on appeal.

Later in the opinion, Chief Judge Parker once again emphasized that, when confronted with an excessive verdict, a trial judge has not only the power but in fact the duty to set the verdict aside. At page 408 of the opinion, the Court said the following:

> "The power and duty of the trial judge to set aside the verdict under such circumstances is well established, the exercise of the power being regarded as not in derogation of the right of trial by jury but one of the historic safeguards of that right.

> \*    \*    \*    \*    \*    \*

> "To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where the ends of justice so require."

These principles have more recently been applied by judges of this Court. In *Casale v. Dooner Laboratories, Inc.,* 343 F.Supp. 917, 918 (D.Md.1972), *aff'd in part, rev'd in part on other grounds,* 503 F.2d 303 (4th Cir.1973), Judge Murray of this Court concluded that a jury verdict was grossly excessive and ordered a new trial unless the plaintiff accepted a remittitur. In *Call Carl, Inc. v. BP Oil Corporation,* 403 F.Supp. 568 (D.Md.1975), *aff'd in part, rev'd in part on other grounds,* 554 F.2d 623 (4th Cir., 1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977), Judge Young of this Court, relying upon the *Armentrout* decision, likewise found the damages awarded grossly excessive and set aside a verdict unless the plaintiffs accepted a remittitur.

The facts here indicate that plaintiff J.C. Holman was indeed seriously injured in this accident. He suffered multiple fractures and spent many weeks in the hospital. Plaintiff now has only partial use of his left arm and hand. Medical expenses amounted to $15,331. Plaintiff's expert testified that plaintiff had an earning capacity at the time of the accident of $92,849. Thus, the total amount of quantifiable damages proved by plaintiff Holman amounted to $108,180.

Applying the principles of the *Armentrout* decision to the facts of this case, this Court finds and concludes that the awards made both to plaintiff J.C. Holman individually and to the plaintiffs jointly are grossly excessive. The most significant factor here is the age of plaintiff Holman. Indeed, were he a younger man, an aggregate jury verdict of approximately $1,500,000 might well be justified. However, at the time of the accident plaintiff Holman was 60 years old, and he now has a life expectancy of 15.2 years. He had planned to work for only a few more years, until he was 65. Before his injury, plaintiff suffered from degenerative arthritis. Many years previously he had sustained an injury to his left hand which affected his ability to use several fingers normally. Although plaintiff's injuries were serious, rehabilitative measures have been reasonably successful. Plaintiff is not bed-ridden nor confined in a wheel chair; rather he is fully ambulatory. In his testimony, plaintiff complained about the device designed to permit him to use his left arm and hand. However, he has declined to submit to an amputation of his left hand so that he might be fitted with a more effective prosthesis. Although plaintiff cannot engage in as many pursuits and activities as he could before the accident, he might, because of his age, reasonably be expected to have discontinued many of them in time.

When lost earnings and medical expenses are subtracted from the total award to plaintiff Holman individually, $1,300,000 was the amount awarded by the jury for pain and suffering, disfigurement, and permanency of his injuries. This Court concludes that an award of this amount was grossly excessive in view of the evidence presented at the trial.

Moreover, $180,000 for loss of consortium is likewise grossly excessive. Plaintiffs did not even seek damages for loss or impairment of the sexual relationship between plaintiff Holman and his wife, and the jury was expressly instructed not to consider this element in deciding upon the amount to be awarded for loss of consortium. In view of the ages of both plaintiff Holman and his wife, this Court concludes that on the record here an award in the amount of $180,000 was likewise grossly excessive.

In opposing the motion of defendant Patuxent for a partial new trial, plaintiffs have cited numerous cases in which substantial awards in excess of $1,000,000 have been upheld on appeal. However, almost all of the cases cited by the plaintiffs involve a plaintiff who was much younger at the time of the injury than plaintiff Holman. Indeed, in most of these cases, the plaintiff was a child, a teenager, or a person in his 20's or 30's with a much greater life expectancy than J.C. Holman.

The jury was instructed in this case that they should not award punitive damages. In view of the deplorable condition of the machine on the day of the accident and the extensive evidence of fault on the part of defendant Patuxent, it was a close question whether or not plaintiffs' claim for an award of punitive damages from defendant Patuxent should be submitted to the jury. After reviewing the Maryland cases, this Court at the trial concluded that plaintiffs had not produced sufficient evidence of actual malice or the legal equivalent of malice on the part of defendant Patuxent for this issue to be submitted to the jury. *See American Laundry Machinery Industries v. Horan*, 45 Md.App. 97, 112, 412 A.2d 407 (1980); *Wedeman v. City Chevrolet Co.*, 278 Md. 524, 532, 366 A.2d 7 (1976). When the amount of the verdicts returned by the jury are considered in the light of the evidence produced, it appears that the jury may have disregarded the Court's instructions

**1206**

and, because of the extensive evidence of fault on the part of Patuxent, included a punitive element in its award of damages in this case. The Court is satisfied that no punitive damages should have been included as a part of the jury's verdicts in this case.

 In granting the motion of defendant Patuxent, this Court will give plaintiffs the option of accepting a remittitur or having a new trial solely on the issue of damages. The principle of remittitur is ancillary to the right of a trial judge to grant a new trial, and a remittitur may be assessed in an amount that will bring the verdict on damages to the maximum amount which the jury could have awarded under the evidence introduced at trial. *Call Carl, Inc. v. BP Oil Corporation, supra*, 403 F.Supp. at 578. In this case, this Court concludes that the maximum amount which the jury could have awarded is $1,000,000 for plaintiff J.C. Holman individually, and $75,000 for the plaintiffs jointly.

### V

### *Conclusion*

For the reasons stated, the motion of defendant Mark for judgment notwithstanding the verdict will be granted, and the motion of defendant Patuxent for a partial new trial on the issue of damages or for a remittitur will likewise be granted. Judgment will be entered in favor of defendant Mark both as to the claims asserted by the plaintiffs and as to the cross claim of defendant Patuxent. Accordingly, it is this 30th day of May, 1985, by the United States District Court for the of Maryland,

ORDERED:

1. That the motion of defendant Mark Industries Inc. for judgment notwithstanding the verdict be and the same is hereby granted;

2. That judgment is hereby entered in favor of defendant Mark Industries, Inc. as to plaintiffs' claims;

3. That judgment is hereby entered in favor of defendant Mark Industries, Inc.

as to the cross claim of defendant Patuxent Equipment Company;

4. That the motion of defendant Patuxent Equipment Company for a partial new trial on damages or for a remittitur, be and the same is hereby granted; and

5. That the verdicts of the jury in favor of the plaintiffs be set aside and a new trial awarded unless within 15 days of the date of this Memorandum and Order the plaintiffs file a remittitur of all sums in excess of $1,000,000 as an award for plaintiff J.C. Holman and of all sums in excess of $75,000 as an award for plaintiffs J.C. Holman and Ann Holman, jointly.