**JOE WESTBROOK, INC., a corporation, d/b/a Westbrook Chrysler-Plymouth, and Joe Westbrook**

v.

**CHRYSLER CORPORATION et al.**

Civ. A. No. 18417.

United States District Court,
N. D. Georgia,
Atlanta Division.

June 28, 1976.

Hugh M. Dorsey, Jr., F. T. Davis, Jr., Gary W. Hatch, and Kent E. Mast, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for plaintiffs.

Michael A. Doyle and Oscar N. Persons with Alston, Miller & Gaines, Atlanta, Ga., for defendants.

## ORDER OF COURT

MOYE, District Judge.

This is an antitrust action brought by plaintiffs Joe Westbrook, Inc., and Joe Westbrook [hereinafter collectively referred to as plaintiffs or Westbrook] to enjoin Chrysler Motors Corporation [hereinafter Chrysler Motors] from terminating a Plymouth Direct Dealer Agreement and seeking damages from the Chrysler Corporation, Chrysler Realty Corporation, and Chrysler Motors [hereinafter collectively referred to as defendants or Chrysler] for violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 and under the Automobile Dealers Day in Court Act [ADDCA], 15 U.S.C. § 1221, et seq. The case is presently before the Court on the defendants' motion for partial summary judgment.

Chrysler Corporation is a Delaware corporation with its principal place of business in the State of Michigan. It engages in the manufacture and assembly of motor vehicles bearing its brand name. At the time that the Complaint was filed, Chrysler Motors was a Delaware corporation with its principal place of business in the State of Michigan. Chrysler Motors was a wholly-owned subsidiary of Chrysler Corporation and was engaged in the sale and distribution, through Chrysler dealers, of motor vehicles bearing its brand names. Effective December 31, 1975, Chrysler Motors was merged with Chrysler Corporation. Chrysler Realty is a Delaware corporation with its principal place of business in the State of Michigan. Chrysler Realty is a wholly-owned subsidiary of Chrysler Corporation and engages in the financing, development, and management of real property, and some of the property and facilities developed or managed by Chrysler Realty are leased or subleased by Chrysler Realty to Chrysler dealers.

Joe Westbrook, Inc., is a Georgia corporation with its principal place of business in Georgia. Joe Westbrook, individually, owns the majority of the stock of Joe Westbrook, Inc. Pursuant to Direct Dealer Agreements executed with Chrysler Motors, Westbrook operated an automobile dealership engaged in the selling and servicing of Chrysler brand automobiles distributed by

Chrysler Motors from May 1957[1] until September 1973 when all relationships with Chrysler Motors were terminated. See Orders entered July 25, 1973, and August 9, 1973.

In 1963 and 1964 Westbrook and defendants began efforts to relocate Westbrook Motors in order to obtain better facilities. Plaintiffs were interested in relocating in the Greenbriar area of Atlanta and, to that end, located four possible sites which Westbrook believed conformed to Chrysler Realty and Chrysler Motors' specifications. Westbrook obtained options on what it considered the best of the four locations and offered the options at no extra cost to Chrysler Motors and Chrysler Realty. Westbrook's idea was that the defendants would buy the property and lease it to him or that Joe Westbrook would buy the property and defendants would become lessees and Westbrook, Inc., a sublessee. Defendants did not accept Westbrook's offer and, before the options expired, Westbrook and another investor purchased the property [hereinafter the Campbellton Road property.]

Thereafter, defendants located property within close proximity to the Campbellton Road property and suggested that Westbrook relocate on that property. Westbrook contends that the Campbellton Road property was superior in all respects to the location offered by defendants. Plaintiff was required by his franchise agreement to obtain defendants' approval for any relocation. Chrysler Realty then purchased other property on Campbellton Road and offered it to plaintiff. Plaintiff rejected this location as the rent was prohibitive. Plaintiff subsequently submitted to defendants two more relocation sites, neither of which were owned or leased by defendants, which were both ultimately rejected by Chrysler.

Plaintiffs contend that throughout this period of time, commencing in 1966, Chrysler Motors was exerting pressure upon plaintiff to relocate by setting unreasonably high Minimum Sales Responsibility levels [MSR] for Westbrook and by demanding that Westbrook meet its MSR by moving to more suitable facilities. Defendants, on the other hand, contend that Westbrook had been operating for at least seven years at substandard performance and that Westbrook failed to cooperate with attempts by defendants to improve Westbrook's MSR performance.

On February 18, 1971, Westbrook and Chrysler Motors entered into a two-year Term Sales Agreement for the sale and service of new Chrysler Motor vehicles, renewal of which was conditioned upon Westbrook's acquiring new facilities acceptable to Chrysler Motors. Chrysler Motors allowed the Term Sales Agreement to expire by its own terms on the grounds that Westbrook had failed to acquire acceptable facilities and had failed to meet its MSR.

On April 30, 1973, Westbrook received a 90-day termination notice on its Plymouth franchise from Chrysler Motors. Westbrook was terminated for inadequate sales performance, inadequate facilities and the location of its facilities.

Plaintiffs claim that defendants have violated the Automobile Dealers Day in Court Act by their failure to act in good faith in terminating plaintiffs' dealership agreement. Plaintiffs also allege that defendants have violated Sections 1 and 2 of the Sherman Act by imposing a tying arrangement upon plaintiffs, unlawfully obligating plaintiffs to lease realty and dealership facilities from Chrysler Realty as a condition for relocating the Westbrook dealership; by combining and conspiring to restrain trade in Chrysler automobiles and property and facilities for Chrysler dealerships; and by attempting and conspiring to monopolize interstate trade in Chrysler automobiles and property and facilities for Chrysler dealerships.

1. Prior to this, Westbrook had been a Chrysler dealer since July 1945 under another franchise agreement.

## I. *Automobile Dealers' Day in Court Act*

Plaintiffs contend that the defendants have failed to act in good faith in terminating plaintiffs' franchise agreement in violation of the ADDCA. Plaintiffs' cause of action under the ADDCA is governed by 15 U.S.C. § 1222, which provides as follows:

"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, cancelling, or not renewing the franchise with said dealer . . . ."

By its terms, § 1222 limits jurisdiction to suits against an "automobile manufacturer." The term "automobile manufacturer" has a special meaning in the ADDCA and is defined at 15 U.S.C. § 1221(a) as follows:

"The term 'automobile manufacturer' shall mean any person . . . engaged in the manufacturing or assembling of passenger cars, trucks or station wagons, including any person . . . which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles."

It is clear that the ADDCA does not apply until a manufacturer-dealer relationship has been created.

■ The term "franchise" is defined at section 1221(b) as follows:

"the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract."

Without a written franchise agreement there can be no claim under the ADDCA. *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 63 (9th Cir. 1973); see, *e. g., Reliable*

*Volkswagen v. World-Wide Auto*, 216 F.Supp. 141 (D.N.J.1963); *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608, 613 (7th Cir. 1972); *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786, 791 (5th Cir. 1971).

Defendants contend that the claim against Chrysler Realty under the ADDCA should be dismissed inasmuch as Chrysler Realty is not a party to any franchise agreement with plaintiff.[2]

Plaintiffs contend that there are two separate causes of action against an automobile manufacturer under the ADDCA. The first is the failure to act in good faith in performing or complying with the franchise agreement, and the second is the failure to act in good faith in terminating, cancelling or not renewing the franchise. Plaintiff claims that the privity requirement applies only to the former cause of action and that the instant action falls under the latter cause of action.

■ However, although plaintiffs' contention that section 1222 provides the dealer with two basic causes of action against an automobile manufacturer is true, see *American Motor Sales Corp. v. Semke*, 384 F.2d 192, 194 (10th Cir. 1967), there is no authority for plaintiff's proposition that the privity requirement is applicable to only one of those causes of action. The two causes of action established by section 1222 refer to the franchise agreement, and must be read in a consistent manner. An action under the ADDCA must be predicated upon a written franchise agreement. An entity which is not a party to such an agreement, even if the entity is otherwise considered an "automobile manufacturer," is not within the Court's jurisdiction as established in section 1222.

■ Plaintiffs also suggest that Chrysler Realty acted as an agent of the Chrysler Corporation and, therefore, should not be permitted to escape the provisions of the

---

**2.** In addition, defendants initially attacked the claim against Chrysler Corporation and Chrysler Motors under the ADDCA. However, the defendants concede that the merger of these two corporations, effective December 31, 1975, subsequent to the filing of the motion, renders this portion of the motion for partial summary judgment moot.

ADDCA merely because it was not a party to the franchise agreement. See *Stansifer v. Chrysler Motors Corp., supra,* at 64. However, although Chrysler Realty is a wholly-owned subsidiary of Chrysler Corporation and the board of directors of Chrysler Realty report regularly to the board of directors of the Chrysler Corporation, see deposition of William G. Bates, p. 10, the fact that a parent-subsidiary relationship exists between the Chrysler Corporation and Chrysler Realty is not dispositive of the agency issue in this situation. See *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., supra,* at 791 (Chrysler Corporation held not responsible for acts of subsidiary, Chrysler Motors, which signed the franchise agreement). As was true in *York Chrysler-Plymouth, Inc.,* plaintiffs have made no showing which would make Chrysler Realty responsible for the termination, cancellation, or failure to renew plaintiff's franchise agreement by Chrysler Corporation. The facts indicate that Chrysler Realty and Chrysler Corporation are separate legal entities each operating in its own sphere. Accordingly, Chrysler Realty, not having been a party to the franchise agreement or responsible under an agency theory for the termination of that agreement, cannot be held accountable, under the ADDCA, for "terminating, canceling, or not renewing the franchise" with plaintiff. See *Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp., supra; R.A.C. Motors, Inc. v. World-Wide Volkswagen Corp.,* 314 F.Supp. 681 (D.N.J.1970); *Reliable Volkswagen Sales & Service Co. v. World-Wide Auto Corp.,* 216 F.Supp. 141 (D.N.J.1963).

II. *Tying Arrangement*

A tie is classically defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Under the Supreme Court cases there are three basic requisites to the establishment of an illegal tie: (1) there must be separate tying and tied products; (2) the seller (here the franchisor) must possess sufficient economic power to restrain competition in the tied product; and (3) the tying arrangement must affect a "not insubstantial" amount of interstate commerce. See *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Northern Pacific Railway Co. v. United States, supra; Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

The Supreme Court cases make clear that, at least when certain prerequisites are met, arrangements of this kind are illegal *per se,* and no specific showing of unreasonable anticompetitive effect is required. *Fortner Enterprises, Inc. v. United States Steel, supra,* 394 U.S. at 498, 89 S.Ct. 1252. The discussion in *Northern Pacific R. Co. v. United States, supra,* 356 U.S. at 5–6, 78 S.Ct. at 518, explains this concept:

"[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . .

" . . . Where [tying] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305–306 [69 S.Ct. 1051, 1058, 93 L.Ed. 1371]. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons

'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 606 [73 S.Ct. 872, 879, 97 L.Ed. 1277]. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. *International Salt Co. v. United States*, 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20]." (Footnote omitted)

The underlying policy basis for the law's disfavor for such arrangements is that they can force a buyer to take a product which he does not want, or at least restrict his choice of supply for the tied product. Such an arrangement also forecloses competitors of the seller from the market in the tied product and acts as a means of extending a monopoly in the tying product to the tied product. Tying arrangements thus have adverse impacts upon the buyer, the seller's competitors, and the public because of the effect on the market for the tied and related products. See *Fortner Enterprises, Inc. v. United States Steel Corp., supra*, 394 U.S. at 512–514, 89 S.Ct. 1252 (White, J., dissenting). Thus the law's concern with tying arrangements has several objects. One object is the buyer who may be forced to take a product or commodity he does not want or whose choice of supply for the tied product is restricted. Another concern, and perhaps the principal concern, is the foreclosure of competition in the tied product and the adverse impact of tying upon the market place.

Plaintiffs contend that they have made the necessary allegations to meet the three criteria for a tying arrangement. Plaintiffs claim that defendant Chrysler Motors refused to renew plaintiffs' Chrysler-Plymouth franchise unless plaintiffs leased the necessary realty and facilities from defendant Chrysler Realty. Thus the tied product in this instance is the realty and facilities necessary for the dealership operation and the tying products are the Chrysler-Plym-

outh automobiles represented by the franchise agreement.

Defendants contend that they are entitled to judgment as to the plaintiffs' tying allegations because (1) plaintiffs cannot meet the jurisdictional prerequisites of the Sherman Act regarding interstate commerce, (2) defendants do not have sufficient economic power with respect to the tying product, and (3) plaintiffs have failed to establish the existence of any tying agreement.

*Existence of tying agreement*

 A tying arrangement need not be committed to the written terms of a contract in order to be actionable, but rather, may be inferred from the defendants' business practices and conduct. *Advance Business Systems & Supply v. SCM Corp.*, 415 F.2d 55 (4th Cir. 1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970); *Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir. 1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961). However, defendants contend that an agreement to require plaintiffs to relocate on property owned by defendants cannot be inferred from their course of dealings. Defendant alleges that it only terminated Westbrook as a result of Westbrook's failure to upgrade its facilities and meet its MSR level. Whether the course of dealings between plaintiffs and defendants raises an inference of a tying arrangement involves issues of fact which the Court cannot decide on a motion for summary judgment. Accordingly, the precise nature of such dealings between the parties and whether, in fact, they establish a tying arrangement, must be determined by the trier of fact at trial.

*Sufficient economic power*

 In order for an illegal tie to exist, the tying product must have sufficient economic power or advantage to appreciably restrain competition in the tied product. *Northern Pacific R. Co. v. United States, supra*.

Westbrook, citing *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), contends that economic power may be inferred from the tying products' desirability to consumers or from the uniqueness of its attributes. Accordingly, Westbrook submits that it is a "consumer" of Chrysler automobiles and due to its franchise agreement and investment in goodwill, Chrysler has the requisite economic power, with respect to Westbrook and other Chrysler dealers, over the tying product. Moreover, plaintiffs contend that the unique Chrysler and Plymouth trademarks are sufficient indicia of economic power to satisfy the requirement for a tying arrangement.

Defendants allege that economic power is a function of the defendants' market share *of automobiles sold to individual consumers,* not franchisees. Furthermore, defendants argue that the concept of "uniqueness," as a factor of economic power, should be analyzed not in terms of the subjective inclinations of a particular Chrysler franchisee, but rather in terms of the nature of the product itself, when compared to the products with which it competes, *i. e.,* all automobiles. Defendants claim that a "unique" product must be sufficiently singular such that its market dominance cannot be threatened by reasonably interchangeable products, such as other brands of automobiles. As to plaintiffs' allegations respecting trademarks, defendants claim that such import economic power only when they are the trademarks of *the* industrial leader in a product industry.

The Court must first determine what yardstick is to be used in measuring economic power. The standard of "sufficient economic power" does not require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. *Fortner* made clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. 394 U.S. at 502–03, 89 S.Ct. at 1258. Mr. Jus-

tice Black offered the following explanation in *Fortner:*

"The decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market. . . . [D]espite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market."

Defendants appear to be arguing the position taken by the Supreme Court in *Times-Picayune Publishing Co. v. United States, supra,* that a tying arrangement is illegal only if the seller has market dominance with respect to the tying product or a substantial volume of commerce in the tied product is restrained. Yet such a definition of economic power has been significantly watered down by the *Northern Pacific-Loew's-Fortner* line of cases. It is fair to say that "sufficient economic power to impose an appreciable restraint on free competition in the tied product" could be achieved where the tying product is simply "distinct" from other similar products; *i. e.,* that some purchasers would prefer the ty-

ing product over similar competing products as long as the price was not prohibitive. Thus the *Northern Pacific-Loew's-Fortner* trilogy reflect a clear trend: that of a steady diminution in the strictness of proof required to establish the economic power requisite of an unlawful tie.

The Supreme Court has not yet been called upon to decide whether economic power may be presumed from the uniqueness or distinctiveness or legal exclusivity of a trademark. However, the Fifth Circuit in *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (1972), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972), has held that the trademark of a leading manufacturer in an industry is persuasive evidence of significant economic power in the hands of the seller. *Accord, Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir. 1971); *Susser v. Carvel Corp.,* 332 F.2d 505 (2nd Cir. 1964) (Lumbard, J., dissenting) *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).[3]

The more relaxed standard being applied to "economic power" in the context of tying arrangements indicates that Chrysler-Plymouth dealers represent "some of the buyers in the market" upon whom the defendants' economic leverage may be imposed. In the plethora of franchise tying cases in recent years the courts have been unanimous in holding that the franchisees were the relevant "consumers" and not the general public-at-large consumer.

▮▮▮ Westbrook contends that because of its franchise agreement, investment, and long number of years as a Chrys-

ler-Plymouth dealer, the only ready and economically feasible source of new automobiles available from a manufacturer for resale is the defendant Chrysler Motors. Furthermore, Westbrook claims that it has invested large sums of money over the years to develop goodwill and name recognition as a dealer of automobiles distributed by Chrysler Motors and to switch to another brand of automobiles would be to forfeit this investment, goodwill, and name recognition. Thus, Westbrook contends that the Chrysler and Plymouth automobiles which Westbrook purchased from Chrysler Motors are not interchangeable with other brands of automobiles and, in the view of Westbrook and other similar Chrysler-Plymouth franchisees, are both desirable and unique. On the basis of economic power as defined in the *Northern Pacific-Loew's-Fortner* cases, as interrelated with the *Warriner-Siegel* cases establishing a trademark as a potential source of economic power, plaintiffs have made the necessary allegations with respect to the requirement of economic power. Certainly, in this context, an automobile trademark is not separate and distinct from the automobile itself, thus the Court does not consider the Chrysler-Plymouth trademark as a separate tying product, but rather, part and parcel of the Chrysler-Plymouth automobiles as the tying product.[4] The question of economic power, therefore, must be considered in light of the allegations made by Westbrook regarding the uniqueness of Chrysler-Plymouth automobiles as established by the leverage imposed by the trademark itself. However, whether the allegations made by Westbrook

---

**3.** Defendants cite *Susser v. Carvel Corp.* for the proposition that a trademark qua trademark is not a sufficient indication of dominance over the tying product to qualify for *per se* treatment under *Northern Pacific.* However, it does not appear that *Susser* is apposite here, for it seems likely that, at a trial on the merits, the trademark, franchise system, and logo of Chrysler-Plymouth automobiles will emerge as far more distinctive than that of the *Carvel Corp.* In any event, the Fifth Circuit, in *Warriner Hermetics, Inc.,* citing Judge Lumbard's dissent in *Susser,* has chosen to follow the *Siegel* view on the impact of a trademark as

proof of requisite economic power. Moreover, the *Susser* dominance test has been somewhat undercut by the Supreme Court's decision in *Fortner.*

**4.** The great majority of trademark cases in this area arise under circumstances where the plaintiff alleges that the trademark in and of itself is the tying product. See, *e. g., Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., supra; Siegel v. Chicken Delight, Inc., supra; Susser v. Carvel Corp., supra; Hawkins v. Holiday Inns, Inc.,* 1976 Trade Cas. ¶ 60,847 (W.D.Tenn.1976).

regarding the absence of interchangeable or substitute products are true is a question of material fact, the existence of which precludes summary judgment as to this element of a tying arrangement.

*Interstate Commerce*

 To find an illegal tying arrangement one must also determine that the alleged tie "affects a not insubstantial" amount of interstate commerce. *International Salt Co. v. United States, supra.* Such a requirement comes from the basic scope of Section 1 of the Sherman Act. The defendants assert that such interstate restraint must be of the tied product and argue that the leasing of property by Chrysler Realty for use as dealership showroom and service facilities is wholly intrastate in character and therefore not within the jurisdictional scope of the Sherman Act. Plaintiffs contend that, with respect to the Sherman Act, jurisdiction is established where the acts complained of have occurred within the flow of interstate commerce or when these acts, when considered in the aggregate, have a substantial effect upon interstate commerce.

 Section 1 of the Sherman Act includes within its scope all prohibited conduct "in restraint of trade or commerce among the several States or with foreign nations. . . ." The jurisdictional reach of Section 1 thus is keyed directly to effects on interstate markets and the interstate flow of goods. In enacting Section 1 Congress "wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . . ." *United States v. South-Eastern Underwriters Assn.,* 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944). As the Court stated in *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974):

"Consistently with this purpose and with the plain thrust of the statutory language, the Court has held that, however local its immediate object, a 'contract, combination . . . or conspiracy' nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce. *E. g., Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 234 [68 S.Ct. 996, 1005, 92 L.Ed. 1328] (1948). 'If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' *United States v. Women's Sportswear Mfrs. Assn.,* 336 U.S. 460, 464 [69 S.Ct. 714, 716, 93 L.Ed. 805] (1949)."

The Court in *Gulf Oil* provides further that the "in commerce" language of the Clayton and Robinson-Patman Acts is more narrow than that of the Sherman Act and denotes only "persons or activities within the flow of interstate commerce," as opposed to the more liberal "affecting commerce" standard of the Sherman Act.

 The "affecting a not insubstantial amount of commerce" requisite for a tying arrangement is co-extensive with the general interstate commerce requirement of Section 1 of the Sherman Act. The necessary connection with interstate commerce may be established by either demonstrating that the alleged anticompetitive conduct occurred *in* interstate commerce, or by showing that the conduct, though wholly intrastate, had a not insubstantial *effect on* interstate commerce. Within this analytic framework the issue is whether the alleged tying arrangement has either directly restrained *or* not insubstantially affected interstate commerce.

 It is settled that the "in commerce" test is not whether the conduct complained of is aimed at a business engaged in interstate commerce, but whether the conduct complained of acts directly upon the interstate aspects of such a business. *United States v. Yellow Cab Co.,* 332 U.S. 218, 230–34, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Here, no matter how entwined in interstate commerce Chrysler Realty may be, the fact remains that the conduct complained *directly* affected only one aspect of Westbrook's business, namely the leasing of realty for its dealership facility. Such conduct remains what it has always been, that is, a

local intrastate activity, not interstate commerce. If the Court were to hold that the exchange of documents across state lines was sufficient to meet the *in* commerce test, as alleged in part by plaintiffs, then practically no commercial enterprise in our increasingly national economy would escape the scope of the Sherman Act.[5] The Supreme Court stated in *Gulf Oil:*

> "The justification for an expansive interpretation of the "in commerce" language [in the Clayton and Robinson-Patman Acts], if such an interpretation is viable at all, must rest on a congressional intent that the Acts reach all practices, even those of local character, harmful to the national marketplace. This justification, however, would require courts to look to practical consequences, not to apparent and perhaps nominal connections between commerce and activities that may have no significant economic effect on interstate markets."

419 U.S. at 198–99, 95 S.Ct. at 400.

■ It is more difficult to decide the result under the second, or "affecting commerce," branch of the analysis. The volume, amount, or quantity of interstate commerce involved is not material under the *in* commerce test, but is often crucial under the *affecting* commerce test. See *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391 n. 6, 395 (4th Cir. 1974). *Rasmussen v. American Dairy Ass'n, supra,* at 526–28; *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 511 F.2d 678 n. 2, 683 (4th Cir. 1975), *rev'd on other grounds,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Thus, if anticompetitive conduct occurs *in* commerce the Sherman Act is triggered. But if such conduct occurs wholly intrastate, the courts must determine whether such conduct "is sufficiently related to interstate commerce to justify the prohibition of that conduct" under the Sherman Act. *Rasmussen v. American Dairy Ass'n, supra,*

at 524; *Hospital Bldg. Co. v. Trustees of Rex Hosp., supra,* at n. 2, 683.

> "There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts."

*Rasmussen v. American Dairy Association, supra,* at 526.

Defendants have the power to shut down plaintiffs' business operation. This clearly has an effect on the interstate flow of automobiles, certainly Chrysler-Plymouth automobiles, from factory to dealer and ultimately to the retail purchaser.

The Court is left with a determination of whether such effects on interstate commerce are insubstantial or not. There is a striking absence in the antitrust decisions of a clear line between those effects that are deemed substantial and those that are insubstantial. The Supreme Court has often determined "not insubstantial" in terms of dollar amounts. Thus in *International Salt Co. v. United States, supra,* the Court held that the "volume of business affected by these . . . [tying agreements] [$500,000 worth annually] cannot be said to be insignificant or insubstantial and the tendency of the arrangement to accomplishment of monopoly seems obvious." 332 U.S. at 396, 68 S.Ct. at 15. In *Fortner* the Court also had occasion to address this subject and in effect, liberalized the *International Salt* criteria. The *Fortner* Court not only made it clear that the "not insubstantial" requirement makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie, but also added that:

> ". . . normally the controlling consideration is simply whether a total amount of business, substantial enough in

5. Although the realty is an essential ingredient of any automobile franchise, it is not a product which travels in interstate commerce and thus it is distinguishable from the cases which hold that where an essential ingredient of the intrastate activity flows in interstate commerce the *in* commerce test is met. See *Rasmussen v. American Dairy Assn.,* 472 U.S. 517 (9th Cir.), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

terms of dollar-volume so as not to be merely *de minimus,* is foreclosed to competitors by the tie. . . ." 394 U.S. at 501, 89 S.Ct. at 1258.

See *Ungar v. Dunkin' Donuts of America, Inc.,* 68 F.R.D. 65, 1975–1 Trade Cases ¶ 60,-204 (E.D.Pa.1975), *rev'd on other grounds,* 531 F.2d 1211, 1976–1 Trade Cases ¶ 60,763 (3rd Cir. 1975), petition for cert. filed (May 10, 1976). In *Fortner,* the Court held that commerce in the amount of $190,000 was sufficiently substantial to satisfy this requirement.

More recently, in *Hospital Bldg. Co. v. Rex Hospital Trustees,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Court reversed the decision of the Fourth Circuit that an insubstantial amount of interstate commerce was affected. Petitioners alleged that respondents had blocked their planned expansion of hospital facilities for the purpose of monopolizing the business of providing hospital services in Raleigh, North Carolina. Petitioner claimed that a portion of its medicines and supplies came from out-of-state, that a portion of its revenues comes from out-of-state insurance companies or the Federal Government, that it pays a management service fee to its out-of-state parent company, and that the planned expansion would be largely financed through out-of-state lenders. The Fourth Circuit concluded that inasmuch as the petitioner's business, providing hospital services, is purely local and that "no source of supply or insurance company or lending institution can be expected to go under if [the petitioner] . . . doesn't expand, and no market price likely will be affected," that a *de minimus* amount of interstate commerce was involved. The Fourth Circuit also noted that the petitioner would be continuing its present operations and the alleged anticompetitive practice would not have the effect of shutting it down. The Supreme Court reversed. Mr. Justice Marshall, in a unanimous opinion, after noting that "thousands and perhaps hundreds of thousands of dollars" in addition to the proposed multi-million dollar expansion, was involved, stated as follows:

". . . [T]he fact that an effect on interstate commerce might be termed 'indirect' because the conduct producing it is not 'purposely directed' toward interstate commerce does not lead to a conclusion that the conduct at issue is outside the scope of the Sherman Act.

\* \* \* \* \* \*

"An effect can be 'substantial' under the Sherman Act even if its impact on interstate commerce falls far short of causing enterprises to fold or affecting market price."

Pp. 744–745, 96 S.Ct. pp. 1852–1853.

In addition to the quantitative measurement of interstate involvement the Court may also consider the practical danger of anticompetitive conduct to the flow of commerce or the potential destructive power of such conduct. See, *e. g., United States v. Employing Plasterers' Ass'n,* 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954); *Burke v. Ford,* 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

In light of both the quantitative and qualitative measurement of interstate commerce, the plaintiffs' allegations fairly claim that the alleged tying arrangement, to the extent that it exists and is successful, places "unreasonable burdens on the free and interrupted flow" of interstate commerce and that such burdens "not insubstantially" affect the interstate trade in automobiles.

In summary, the Court finds as follows: (1) plaintiffs have properly alleged, with supporting evidence, the three fundamental prerequisites of an illegal tying arrangement under Section 1 of the Sherman Act; (2) factual issues regarding the defendants' course of conduct preclude a determination as to whether such a tying arrangement actually exists; (3) factual issues preclude a determination of whether the tying product provides defendants with the requisite economic power to restrain trade in the tied product; and (4) the alleged tying arrangement, if found to exist, affects a not insubstantial amount of interstate commerce.

### III. *Standing*

Plaintiffs allege, under Sections 1 and 2 of the Sherman Act, that the defendants have unlawfully attempted to monopolize and combined and conspired to restrain and monopolize interstate trade or commerce in the acquisition, lease, or other disposition of real property and the development, construction, and lease of facilities utilized for the retail sale of Chrysler and Plymouth automobiles throughout the United States and in various geographic submarkets thereof, including the Atlanta metropolitan area. Defendants contend that plaintiffs lack standing to raise these allegations.

Jurisdiction to entertain these allegations is invoked pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, which authorizes a private plaintiff to sue for injuries sustained to business or property as a consequence of an antitrust violation. The Fifth Circuit has explained the test for determining standing under Section 4 as follows:

"By the terms of § 4, two criteria must be satisfied before standing is established. . . . First, the plaintiffs must show that they have suffered injury to 'business or property,' recently defined as referring to 'commercial interests or enterprises.'

\* \* \* \* \* \*

"To satisfy the second criteria for establishing standing, plaintiffs must show that their injuries were incurred 'by reason of' the defendants' illegal activities.

\* \* \* \* \* \*

"In this circuit the limitation of this principle has been stated as requiring the plaintiff to show that he is 'within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby. . . ."

*Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 48–49 (5th Cir. 1974).

Plaintiffs have satisfied the first of these requirements. The Complaint alleges injury to the commercial interests of Westbrook Motors in its capacity as an independently-owned retail dealer of Chrysler manufactured automobiles. The claimed injury is losses incurred in the operation and eventual termination of this retail dealership.

To satisfy the second criteria plaintiffs must show that these injuries were sustained "by reason of" defendants' alleged unlawful activities. To meet this condition plaintiffs must show that they are "within the sector of the economy in which the violation threatened a breakdown of competitive conditions." However, this does not mean that the plaintiffs must be in competition with the defendant. See *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414, 417 (4th Cir.), *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

Plaintiffs have alleged antitrust violations in the acquisition, lease, or other disposition of real property and dealership facilities. Plaintiffs are clearly consumers of real property and dealership facilities and defendants are suppliers of same. Whether defendants acted in an anticompetitive fashion and whether such actions caused plaintiffs' injuries, *i. e.,* whether plaintiffs could have sought real property and dealership facilities from other sources and avoided the injury suffered, present material questions of fact which preclude summary judgment on this issue.

### IV. *Section One*

In Count Two of the Complaint, plaintiffs allege that Chrysler Motors and Chrysler Realty have "engaged in unlawful combination and conspiracy, in unreasonable restraint of trade in Chrysler and Plymouth automobiles and in real property and facilities for the sale thereof" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs' Complaint, ¶ 34. Defendants contend that plaintiffs have failed to properly allege restraint of trade in any relevant product market and, furthermore, that Chrysler Corporation and its subsidiaries cannot combine and conspire in violation of Section 1.

*Relevant market*

Defendants do not appear to oppose plaintiffs' contention that the relevant product market is not an essential element of pleading in a Section 1 claim. See *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Defendants claim, however, that inasmuch as plaintiffs have chosen to allege the relevant product market it is subject to the Court's scrutiny. Defendants contend that as a matter of law the relevant market alleged by plaintiffs does not fall within the protections of Section 1.

A proper relevant market under Section 1 is a market, the restraint of which would be unreasonable. Thus, the first step in determining the reasonableness of any restraint is to isolate the market which is affected by the restraint. See *United States v. E. I. Du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The Supreme Court has set guidelines for the definition of the relevant market in Section 2 cases in *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), as follows:

> "In [the] case of a product it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product. That is the teaching of the *duPont* case . . . that commodities reasonably interchangeable make up that 'part' of trade or commerce which § 2 protects against monopoly power."

The key words are "substitutes" and "interchangeability" of products, that is, to what extent, if any, demand for a product is cross-elastic.

Defendants contend that the product market alleged is too narrowly drawn in that it omits products which are in effective competition with Chrysler and Plymouth automobiles. Defendants claim that the demand for other brand automobiles is essentially cross-elastic with demand for Chrysler and Plymouth automobiles. Defendants make a similar argument regarding real property and facilities for the sale of Chrysler and Plymouth automobiles.

Defendants cite the decision of Judge Freeman in *Daniell v. Chrysler Motors Corp.,* Civil Action No. 13295 (N.D.Ga., June 30, 1972), in support of their contention that the relevant market is much broader than Chrysler and Plymouth automobiles. *Daniell* was an action by a potential franchisee against Chrysler Motors Corp. for its failure to grant a Chrysler franchise to plaintiff. The relevant market was determined based upon the facts of the case, and the finding of no Sherman Act violations was based upon the rule of reason. The Court stated:

> " . . . it is well settled that a manufacturer may discontinue dealing with a particular distributor or dealer of its products 'for business reasons which are sufficient to the manufacturer, and adverse effects on the business of the distributor is immaterial *in the absence of any arrangement restraining trade.*'" (emphasis added)

> \* \* \* \* \* \*

> "The exercise of a manufacturer's right to choose and determine dealers of its products is not an anti-trust violation *unless such action is motivated by anti-competitive intent or is in restraint of trade.*" (emphasis added)

*id.* at 7.

Thus the decision in *Daniell* indicates that under a different fact setting a single brand of automobiles could be construed as the relevant market. Indeed, this was the finding of the district court in *Coleman Motor Company v. Chrysler Corp.,* 376 F.Supp. 546 (W.D.Pa.1974), *vacated,* 524 F.2d 1338 (3d Cir. 1975). The Court in *Coleman* held that the relevant market, for purposes of both Sections 1 and 2, was the *wholesale* market for new Dodge automobiles in Allegheny County, Pennsylvania. Such a holding was based on the finding that the Dodge dealers could not practically substitute other brand automobiles for those of the Chrysler Corporation and that

demand, at the dealer level, was not cross-elastic. *Accord, Mt. Lebanon Motors, Inc. v. Chrysler Corp.,* 283 F.Supp. 453 (W.D.Pa. 1968); *REA v. Ford Motor Co.,* 355 F.Supp. 842 (W.D.Pa.1973), *rev'd on other grounds,* 497 F.2d 577 (3rd Cir. 1974), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106. See also *Aiken v. Chrysler Motors Corp.,* Civil Action No. 16861 (N.D.Ga., Sept. 30, 1975), where the Court stated the following:

"The fact that the relevant market is year end Dodge automobiles at the wholesale level . . . becomes obvious when one considers the total lack of cross-elasticity of demand as well as the distinct nature of the customers, *i. e.,* Dodge dealers do not buy Chevrolets and vice versa."

The Court in *Coleman* recognized that a manufacturer has a right to establish an exclusive dealer in an area or terminate one dealer and substitute another and, although existing trade might thereby be restrained, it would not violate the Sherman Act, 376 F.Supp. at 554. But such acts do violate Section 1 when they involve a conspiracy intending to monopolize or restrain trade, to the damage of the plaintiff, 376 F.Supp. at 553. Defendants argue that the district court's decision in *Coleman* is entitled to little weight inasmuch as it was vacated by the Third Circuit, 525 F.2d 1338 (1975). Yet the Third Circuit did not hold that Dodge automobiles could not be a relevant market under the Sherman Act, but only that the evidence offered below did not support such a finding and should be reconsidered. The Third Circuit specifically held that a determination of the relevant market could be made from the standpoint of the dealer as consumer rather than the consuming public-at-large and that "Chrysler's activities might be held to be an unreasonable restraint of trade." 525 F.2d at 1347.

█ Plaintiffs allege that defendants are the only source of Chrysler-Plymouth automobiles. Plaintiff also claims that because of his large investment in money, goodwill, and name recognition tied up in Chrysler-Plymouth automobiles, there are no substitutes or interchangeable products.

If such is true, then the relevant product market is the wholesale market in Chrysler-Plymouth automobiles. However, resolution of this question involves issues of fact which cannot be resolved on a motion for summary judgment and must be reserved for decision by the trier of fact.

█ Even if such a market is deemed to be the relevant market, however, such a determination would not be dispositive of a Section 1 violation. Plaintiffs must still prove that defendants did in fact combine and conspire with the intent to restrain trade, and did in fact restrain trade.

*Combination and Conspiracy*

Defendants contend that the doctrine of intra-enterprise conspiracy has been narrowed to those situations where commonly owned firms or parent-subsidiary corporations alleged to have conspired with each other (1) hold themselves out as distinct entities *and* (2) are in competition with one another. Plaintiffs agree that the first element must be present but contend that it is unnecessary that the corporations be in competition with one another. Although the law is not clear on this question, the weight of authority seems to be in plaintiffs' favor.

The Supreme Court has said that "common ownership and control does not liberate corporations from the impact of the antitrust laws." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951), see also *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1946); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1950); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1967); *United States v. Citizens and Southern National Bank,* 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41, 43 U.S.L.W. 4779, 4788 (1975). Although it is true, as defendants contend, that the corporations involved in most of these decisions were in competition with one another, *e. g., Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,*

*supra; United States v. Yellow Cab Co., supra; Timken Roller Bearing Co. v. United States, supra,* the Supreme Court has left the door open respecting commonly owned firms or parent-subsidiary corporations not in competition with one another. See *Perma Life Mufflers, Inc. v. International Parts Corp., supra.* In *United States v. Yellow Cab Co., supra,* 332 U.S. at 227, 67 S.Ct. at 1565, the Court stated that "[t]he corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act." *Accord, United States v. Citizens & Southern National Bank, supra* 422 U.S. 86, 95 S.Ct. 2099, 43 U.S.L.W. at 4788.

Defendants cite four decisions as authority for their position. In *Ark Dental Supply Co. v. Cavitron Corp.,* 461 F.2d 1093 (3rd Cir. 1972), the Court held that an agreement between two subsidiaries of the same parent company to restrain trade was not a violation of Section 1 as it "was nothing more than a business decision" to sell the goods of one subsidiary only to the other subsidiary. But in a footnote the Court also stated that there is ample authority to find no Section 1 violation inasmuch as the subsidiaries were not in competition with each other. 461 F.2d at 1094 n. 1. However, the Third Circuit has apparently retreated from this position in a more recent decision. In *Coleman Motor Co. v. Chrysler Corp., supra vacated,* 525 F.2d 1338 (3rd Cir. 1975), the district court found Chrysler Corp. and Chrysler Motors, non-competing parent-subsidiary corporations, to be in violation of Section 1. The Court stated:

"Thus, we find that the holdings of the Supreme Court are that related companies may be found in violation of Section 1 of the Sherman Act if there are contractual arrangements, combinations or conspiracies and the objectives or reasons for such arrangements, combinations or conspiracies are deemed illegal either per se, or are found to be an unreasonable restraint based upon the proof of their effect and intent."

376 F.Supp. at 553. In vacating the district court's decision on other grounds, the Third

Circuit did not disagree with the above statement on the state of the law.

Defendants also cite two other district court decisions, *Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321 (E.D.N.Y.1970), *aff'd per curiam,* 451 F.2d 593 (2nd Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972), and *Call Carl, Inc. v. BP Oil Corp.,* 403 F.Supp. 568 (D.Md.1975). *Beckman* was an action against a parent corporation and its non-competing subsidiary. Holding that there was no violation of Section 1, the district court distinguished *Kiefer-Stewart* as follows:

" . . . the conspiracy in that case was between two competing subsidiary companies, whereas in the instant case Beckman does not contend or offer any evidence to indicate that Fyre-Safety [the subsidiary] and Kidde [the parent] were in competition with one another."

316 F.Supp. at 1325. Yet further in the opinion the district court also applied the "rule of reasonableness" or motive test, finding that discussions between the two companies was nothing more than "internal dialogue leading to a decision on the part of a single business unit to exercise its right to select or disenfranchise a particular distributor." 316 F.Supp. at 1326.

*Call Carl* also was an action against parent-subsidiary corporations. The district court, although recognizing that such affiliated corporations could violate Section 1, stated that

"there is certain persuasive authority which holds that a parent and subsidiary cannot conspire in violation of Section One of the Sherman Act *if they are not in actual competition in the market. See Ark Dental Supply Co. v. Cavitron Corp.,* 461 F.2d 1093, 1094 n. 1 (3d Cir. 1972); *United States v. Arkansas Fuel Oil Corp.,* 1960 Trade Cas. ¶ 69,619 (N.D.Okl.1960); *contra, T. V. Signal Co. v. Am. Tel. & Tel. Co.,* 462 F.2d 1256, 1260 (8th Cir. 1972); *Tamaron Distrib. Corp. v. Weiner,* 418 F.2d 137, 139 (7th Cir. 1969)."

403 F.Supp. at 572.

Both defendants and plaintiffs cite, as support for their respective positions, the

following dicta from the Supreme Court's decision in *United States v. Citizens and Southern National Bank, supra,* 422 U.S. at 116, 95 S.Ct. at 2116, 43 U.S.L.W. at 4788:

> "This Court has held that even commonly owned firms must compete with each other, if they hold themselves out as distinct entities. 'The corporate interrelationships of the conspirators . . . are not determinative of the applicability of the Sherman Act.'"

Clearly only companies which deal in competing products can compete with each other, yet the Court did not speak of non-competing affiliated corporations. It appears that the Supreme Court is holding steadfast to its position that competing affiliated corporations can violate Section 1 while not closing the door on non-competing affiliated corporations.

In addition to the *Citizens and Southern National Bank* and *Coleman Motor Co.* decisions, plaintiffs cite three decisions as supporting the proposition that non-competing affiliated corporations can conspire in violation of Section 1.

Both the Seventh and Eighth Circuits have decided directly in plaintiffs' favor. In *T. V. Signal Co. v. Am. Tel. & Tel. Co.,* 462 F.2d 1256 (1972), the Eighth Circuit, noting that the defendants parent-subsidiary corporations were not competitors, held:

> "It may be, as defendants argue, that the intracorporate conspiracy doctrine should be limited to competitors or to a buyer-seller relationship but we know of no Supreme Court decision which has so held. . . . We believe that the complaint sufficiently states a claim under § 1 of the Sherman Act."

462 F.2d at 1260.

Similarly the Seventh Circuit, in *Tamaron Distributing Corp. v. Weiner,* 418 F.2d

137, 139 (1969), held that an agreement between a manufacturer and his representative, who were not competitors but were separate legal entities, stated a claim under Section 1 of the Sherman Act. *Accord, United States v. General Motors Corp.,* 121 F.2d 376, 404 (7th Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497 (1941).

Two district courts have also implicitly held that non-competing affiliated corporations could combine and conspire in violation of Section 1 in *Mt. Lebanon Motors, Inc. v. Chrysler Corp.,* 283 F.Supp. 453, 458 (W.D.Pa.1968), and *DeFilippo v. Ford Motor Co.,* 378 F.Supp. 456, 464 (E.D.Pa.1974).

 Thus the question whether competition is required among affiliated corporations to properly state a claim under Section 1 of the Sherman Act remains unanswered.[6] The Supreme Court has provided no definitive answers. The Seventh and Eighth Circuits hold that such competition is unnecessary. The Third Circuit's position is one of confusion. And the issue has been resolved both ways in a number of district courts. The question is presently before this Court on a motion for summary judgment. Set against the uncertainty in the law on this subject, the Court finds that resolution of the issue is best deferred until a complete disclosure of the facts, motives, and effects of any agreement between the defendants is revealed.

## V. Section Two

Plaintiffs allege that defendants have attempted to monopolize interstate trade or commerce and have engaged in a combination or conspiracy to monopolize interstate trade or commerce in violation of Section 2 of the Sherman Act.

Defendants contend that there can be no illegal monopolization here because Chrys-

---

**6.** Even the commentators seem a bit confused. One authority often cited, Willis & Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries,* 43 N.Y.U.L.Rev. 20, 35 (1968), argues that to allow affiliated corporations not in competition with each other to constitute a conspiracy would discourage corporations from centralizing corporate management, which they would normally do for reasons other than market considerations. Yet the authors go on to suggest that the intracorporate conspiracy theory be utilized not only when parent and subsidiary publicly adopt competitive postures, but also in situations in which the parent does business through subsidiaries and uses the subsidiaries to produce anticompetitive effects.

ler has a right to monopolize its own product which does not constitute a relevant market in itself.[7] Therefore, inasmuch as defendants cannot be guilty of monopolization, they cannot be guilty of an attempt or conspiracy to monopolize. In short, there is nothing unlawful about an attempt or conspiracy to accomplish a lawful purpose, unless the attempt or conspiracy is engaged in by unlawful means, which is not an allegation in the action at bar.

Plaintiffs attempt to parry the thrust of defendants' argument by contending that defendants may violate Section 2 by an attempt or conspiracy to monopolize trade in any singular product in interstate commerce and that proof of a relevant market is not required for a Section 2 attempt or conspiracy allegation, but rather, is only necessary for an allegation of monopolization.

Taken to its logical conclusion, the plaintiffs' argument could result in a finding that it is unlawful to conspire or attempt to accomplish by legal means an end which is also legal. Such a result finds no support in the law. The illegality of an alleged attempt or conspiracy to monopolize must be tested in part by reference to the existence of a relevant market.

 Monopolization under Section 2 consists of a combination or conspiracy to acquire or maintain the power to exclude competitors from the interstate trade or commerce in a relevant market, provided that the parties so charged have the power to exclude actual or potential competition from the relevant market and have the intent and purpose to exercise that power. *American Tobacco Co. v. United States*, 328 U.S. 781, 808–15, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); see also, *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n. 2 (5th Cir. 1969). An attempt to monopolize is defined as follows:

" . . . the employment of methods, means and practices which would, if successful, accomplish monopolization, and

which, though falling short, nevertheless approach so close as to create a dangerous probability of it. . . . "

*American Tobacco Co. v. United States, supra*, 328 U.S. at 785, 66 S.Ct. at 1127. See also *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 (5th Cir. 1969). Moreover, the Supreme Court has made clear that an essential element of an attempt to monopolize is intent. *Swift & Co. v. United States*, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *American Tobacco Co. v. United States, supra; Cliff Food Stores, Inc. v. Kroger, Inc., supra.* Section 2 thus directs itself not only against the completed result of monopolization but the existence of the dangerous probability as well. The Fifth Circuit, in *Sulmeyer v. Coca Cola Company*, 515 F.2d 835, 850–51 (5th Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976), has stated the following:

"The offense of attempted monopolization requires both specific intent to accomplish the illegal result (acquisition of monopoly power in the relevant market), and a dangerous probability of success in that endeavor."

Thus reference to the existence of a relevant market is essential in examining an allegation of attempt to monopolize. See also, *Walker, Inc. v. Food Machinery*, 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Southern Concrete Co. v. United States Steel Corp.*, 394 F.Supp. 362, 379 (N.D.Ga.1975).

 Similarly, reference must be made to the relevant market respecting the alleged conspiracy. The conspiracy asserted by plaintiffs consists of an agreement among the defendants to accomplish together the unlawful act of monopolization. It is true, however, that the offenses of monopolization, attempt, and conspiracy to monopolize are separate offenses requiring different proofs. See *American Tobacco*

---

**7.** It is worth noting at this point that defendants agree that if their product did constitute a relevant market, a premise which defendants strenuously oppose, then it would be possible for defendants to engage in an illegal monopolization. Defendants' Brief, p. 23.

*Co. v. United States, supra,* 328 U.S. at 789, 66 S.Ct. 1125; *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2nd Cir. 1961). While attempted monopolization requires conduct imminently threatening monopolization, all that is needed to establish conspiracy to monopolize is the act of conspiring. See *Bowen v. New York News, Inc.,* 366 F.Supp. 651, 676 (S.D.N.Y.1973), *modified on other grounds,* 522 F.2d 1242 (2nd Cir. 1975). There is no necessity to consider monopoly power, *i. e.,* market power in a relevant market, in a Section 2 conspiracy case. See *United States v. Yellow Cab Co., supra,* 332 U.S. at 225–26, 67 S.Ct. 1560; *United States v. Consolidated Laundries Corp., supra,* at 573. The only inquiry is whether there has been a combination or conspiracy "to monopolize any part of the trade or commerce among the several States." See *American Tobacco Co. v. United States, supra,* 328 U.S. at 789, 66 S.Ct. 1125, 1129. Plaintiffs suggest that this means that a Section 2 violation has been committed if parties conspire to monopolize any single product, regardless of its interchangeability with other products, which is involved in interstate commerce.

However, the watchword of Section 2 is monopoly, and the basic element of the offense of monopolization is the possession of monopoly power—that is, ability to control prices in and exclude competitors from the relevant market. Although a Section 2 conspiracy may exist despite the lack of the necessary monopoly power to actually succeed in monopolizing a relevant market, the requisite intent to monopolize must be present, and that, by definition, involves a relevant market. Defendants cannot be held liable under the Sherman Act for intending to do something which is perfectly lawful. For example, if X and Y conspire to exclude competitors from the market for ABC goods, ABC goods constituting a relevant product market, then the fact that X and Y do not have the requisite monopoly power is not a defense inasmuch as what they conspire and intend to do is unlawful. However, if X and Y conspire to exclude competitors from the market for ABC goods, and X and Y contend that ABC goods do not constitute a relevant market and in fact they do *not* constitute a relevant product market, then X and Y have not intended to monopolize in violation of Section 2 inasmuch as what they conspire and intend to do is not unlawful. In short, an element of conspiracy is the specific intent to monopolize; monopolization involves the exclusion of competitors from the relevant product market; the defendants are presumed to know the law, that is, that a relevant product market is an essential element of the offense of monopolization; by claiming that there is no relevant product market defendants assert that they did not have the specific intent to monopolize, a necessary element of conspiracy.

In the action at bar, therefore, reference to a relevant market becomes an important factor in resolving the question of conspiracy to monopolize inasmuch as it is pivotal in determining the requisite intent to monopolize, that is, the intent to effectively eliminate competition in the relevant market and in determining that the alleged conspirators intended an unlawful result. However, unlike the alleged attempt to monopolize, reference to a relevant market is not necessary with regard to the alleged conspiracy to prove the existence of monopoly power.

Nonetheless, as the Court discussed regarding the alleged violation of Section 1, factual issues preclude a determination on a motion for summary judgment of the existence and boundaries of the relevant product market and, therefore, preclude a determination of the conspiracy and attempt issues.

## VI. *Conclusion*

To summarize, the Court finds as follows: (1) Chrysler Realty is not a proper party under the Automobile Dealers Day in Court Act; (2) The existence of material questions of fact precludes a determination as to the actual existence of a tying arrangement and whether the tying product provides the defendants with the requisite economic

power, although if the alleged tying agreement is found to exist it affects a not insubstantial amount of interstate commerce; (3) The existence of material questions of fact preclude a determination respecting the anticompetitive effect of defendants' conduct and whether such conduct was the cause of plaintiffs' injuries, thus precluding a decision on plaintiffs' standing to raise Sections 1 and 2 claims as to the realty and facilities for a Chrysler dealership; (4) The existence of material questions of fact preclude a determination of a definable relevant market and of the alleged conspiracy of affiliated corporate defendants under Section 1; and (5) The existence of material questions of fact as to the relevant product market preclude a resolution of the attempt and conspiracy to monopolize allegations under Section 2.

Accordingly, the defendants' motion for partial summary judgment as to the cause of action against Chrysler Realty under the Automobile Dealers Day in Court Act is hereby ORDERED GRANTED. The defendants' motion for partial summary judgment as to the causes of action under Sections 1 and 2 of the Sherman Act are hereby ORDERED DENIED.